W. A. WELLS, Appellee, v. THE HOCKING VALLEY COAL
COMPANY and E. H. GIBBS, Appellants.

**Brokers:** OPTION: ACTION FOR COMPENSATION: EVIDENCE: QUES-
1 TION OF FACT. In seeking to recover compensation for procur-
ing a purchaser for defendant's coal mines, the evidence as to
whether the sale was consummated prior to a certain date, at
which the plaintiff's option to purchase the property himself
or negotiate a sale to another expired, is held to present a
question of fact for the jury.

**Same.** One who has executed to a broker an option contract by
2 which the broker has exclusive right to purchase certain prop-
erty himself or procure another to purchase within a specified
time, and has agreed therein to assist the broker in every
way possible to effect a sale, cannot be heard to say during
the life of the option that he conducted an independent nego-
tiation with the buyer; but whatever he does in that regard
will be treated as referable to the agreement with the broker.
Under the evidence the question of whether the broker's
negotiations with a subsequent purchaser had been abandoned
and a sale made independent of his agency was for the jury.

**Same:** PERFORMANCE OF AGREEMENT. Where a broker would have
3 been entitled to compensation for the sale of a coal company's
property had the purchaser chosen to take title by an ordinary
transfer, his right to recovery will not be affected by an
assignment of the capital stock of the company instead; since
the transfer of the property is in substance, if not in legal effect,
as fully accomplished by the one method as the other.

**Same:** CONTEMPORANEOUS ORAL CONTRACTS: PROOF. A contemporane-
4 ous independent verbal contract relating to the subject-mat-
ter of a written agreement, which is not inconsistent therewith,
does not impair or vary the writing and may be proven; so
that a written option to purchase corporate property or to
sell the same to another within a stated time, and to receive
as compensation all in excess of a given sum, is not incon-
sistent with an oral agreement to find a purchaser for the
capital stock of the corporation.
Sherwin, J., dissenting.

*Appeal from Washington District Court.—* HON. B. W.
PRESTON, Judge.

WEDNESDAY, FEBRUARY 19, 1908.

ACTION at law to recover compensation for services alleged to have been rendered in procuring the sale of property. Verdict and judgment for plaintiff, and defendants appeal.— *Affirmed.*

*Geo. W. Seevers, L. C. Blanchard, William McNett,* and *C. J. Wilson,* for appellants.

*N. T. Guernsey, J. F. Lacy, H. W. Gleason,* and *S. W. Brookhart,* for appellee.

WEAVER, C. J.— The petition alleges that the Hocking Coal Company, a coal mining corporation, entered into an agreement with plaintiff, whereby the latter undertook the effort to find a purchaser for all of the property of every kind and character owned by said corporation, and, if successful, was to receive for the services so rendered a margin of the selling price in excess of a stated minimum or net sum to be paid to the company. This agreement, it is alleged, was in part written and in part oral. The written portion of said alleged contract is to be found in two instruments known in the record as "Exhibit A" and "Exhibit B," which will be hereinafter set out in full. As a part of or as collateral to said contract, it is alleged that the parties orally agreed that if plaintiff should procure a purchaser to whom such sale could be made by an assignment to him of the entire capital stock of said corporation, then the plaintiff should be entitled to compensation on the same basis as if the deal had been consummated by a direct conveyance of the property, under the terms of the written option hereinafter set out. It is also alleged that in pursuance of said contract plaintiff, with assistance rendered by defendant Gibbs in pursuance of the written agreement referred to, procured or

brought about a sale to George W. Seevers for a sum largely in excess of the net price reserved by said corporation, but that defendants neglect and refuse to pay the agreed commission. It should also be said that, according to plaintiff's claim, and as a further consideration for the commission or margin to be paid to him in case he found a purchaser on the agreed terms, he undertook and agreed to convey to defendants a certain tract of land in the State of Texas, which conveyance he avers his readiness to make, and tenders the same to the defendants. Defendants deny the petition generally, and aver fraud and misrepresentation by plaintiff with respect to the location and quality of the Texas land, and further say that, prior to the date of the writings sued upon, defendants began negotiations for the sale to Seevers, and had authorized Seevers to sell the property, and that the sale to him was not made until after June 2, 1902, when all rights which the plaintiff may have had under the contracts on which the suit is brought had wholly expired. By an amendment to the answer, filed long after the suit was brought and after the case had once been tried, defendants pleaded the statute of frauds as a bar to the plaintiff's claim, also want of consideration for the alleged parol agreement set up in the petition.

It will serve to make clear some of the matters hereinafter referred to, to state that the defendant E. H. Gibbs was president and principal stockholder in the Hocking Coal Company, and that the other officers and stockholders appear to have acquiesced in his leadership, and in his management of the effort to make a sale of the corporate property. The mine owned by the company was located in Monroe county and had no railroad outlet except over the Iowa Central Railway Company's track, and, for a time at least, the rules and regulations imposed by that company upon the transportation of the products of the mine had an unfavorable effect upon its profitable operation, and because of this, and perhaps other influences, the coal company had for some time been

anxious to dispose of its entire property.   Prior to the date
of the writings in suit, Gibbs, acting for the coal company,
had given to the plaintiff two successive written options for
the sale of the property, both of which had expired without
anything being accomplished.   During the same time it
would appear that the Iowa Central Railway Company was
desirous of purchasing the mine, and more or less negotia-
tions looking to that end had taken place between the de-
fendants and Mr. George W. Seevers, who was attorney and
representative of said railway company.   These negotiations
had not progressed satisfactorily to the defendants, and
Gibbs began looking elsewhere for a purchaser.   The plain-
tiff was at this time engaged in the service of another coal
company controlled by or operated in connection with the
Northwestern Railway Company, and it is not an unrea-
sonable inference from the situation that Gibbs hoped plain-
tiff could enlist the interest of the latter coal or railway
company in the purchase of the mine, and perhaps he also
saw in such negotiations a legitimate method by which to
enhance the value and desirability of the property in the
eyes of Mr. Seevers' client.   Whatever may be the truth in
this respect, it appears that in April, 1902, Gibbs had so
far despaired of bringing about the sale to the Iowa Central
Company that on the 8th day of said month he gave to plain-
tiff another written option, which is the first of the two writ-
ings entering into the alleged contract upon which this suit
is brought, and is in words and figures as follows:

(Exhibit A.)   Oskaloosa, Iowa, April 8, 1902.   In
consideration of ($1.00), paid in hand, the receipt of which
is hereby acknowledged, and other valuable considerations,
hereinafter stated, the Hocking Coal Company (a corpora-
tion doing business under the laws of Iowa), situated in
Monroe county, near Albia, Iowa, hereby agrees to sell, trans-
fer and deliver, free of every and all incumbrances, to W. A.
Wells, of Mahaska county, Iowa, his heirs or assigns, all
their rights, titles and interests of every kind whatsoever,

owned, leased or operated by the said Hocking Coal Company, including all lands owned, leased or optioned, all coal owned, leased or optioned, all buildings, machinery, live stock and merchandise, in fact everything pertaining to or forming a part thereof, of the said Hocking Coal Company. Providing, however, that the said W. A. Wells, his heirs or assigns, on or before June 1, 1902, pay or cause to be paid to the said Hocking Coal Company, the sum of four hundred and fifty thousand dollars ($450,000), and a deed in fee simple to four hundred and forty-three (443) acres of land owned by the said W. A. Wells, situated in Dallas county, Texas, near the city of Dallas, Texas, known as the King tract, and part of the McDowell survey. It is further understood that E. H. Gibbs of Oskaloosa, Iowa (president of the Hocking Coal Company of Monroe county, Iowa), personally agrees to assist the said W. A. Wells in every possible manner, to consummate the above deal, as set forth in the above contract, and that he personally guarantees the specific performance of the Hocking Coal Company's part of the above contract. Hocking Coal Company, By E. H. Gibbs, Pres. E. H. Gibbs.

The price named in this option is materially less than the figure which had been placed upon the property in the prior options given to the plaintiff. At the date of this writing or soon thereafter plaintiff opened negotiations in Chicago with one Blackmar for the sale of the property. A day or two later plaintiff called Gibbs to Chicago, and while there, on April 12, 1902, the latter received a telegram from Seevers stating that he had sold the Hocking property under authority received from Gibbs. This dispatch Gibbs handed over to plaintiff, who telegraphed to Seevers saying: " Mr. Gibbs refers your message to me as the property is in my hands. Make me your best cash offer at once, care Grand Pacific." To this Seevers responded with message to Gibbs saying that he held the Hocking property with authority to sell, and had sold, and would expect an immediate transfer, and had no offer to make otherwise. Plaintiff thereafter, continuing his negotiations with Blackmar, applied to Gibbs for a letter to be used in forwarding the deal, and thereupon

Gibbs addressed a letter to him under date of April 15, 1902, stating that if taken at once he would sell the Hocking Coal Company's property of all kinds, with guaranty of title, and placing the price at $1,000,000; closing the communication with this language: "If this sum is paid on or before June 1st, 1902, I hereby agree to personally guarantee the delivery of the Hocking Coal Company property in fee simple, and authorize W. A. Wells of Oskaloosa, Iowa, to enter into a contract to sell and deliver said property according to the above-mentioned terms." That the price here named was exaggerated for trading purposes, and with the expectation that the letter would be exhibited to Blackmar, is made evident from the situation as well as from the terms of the option then held by plaintiff and the supplement thereto which we are about to mention. On the following day, April 16, 1902, plaintiff and Blackmar, trustee, entered into a contract by which the latter obtained an option to purchase the property in question for the sum of $500,000, of which the sum of $5,000 was then and there paid. By the terms of the said contract the balance of the purchase price was to be paid, and the sale to be completed on or before June 1, 1902, and upon failure of Blackmar to appear and perform his agreement within that time the advance payment of $5,000 was to be forfeited to the plaintiff. On the same day Gibbs for himself and the coal company indorsed upon the contract a guaranty to Blackmar of the specific performance thereof by Wells. Thereafter, under date of April 18, 1902, Gibbs and Wells entered into a further or supplementary contract, which is Exhibit B hereinbefore referred to, and is in words and figures as follows:

Exhibit B. This agreement made the eighteenth (18) day of April, A. D. 1902, E. H. Gibbs, of Mahaska county, Iowa, party of the first part, between W. A. Wells of the same place, party of the second part. Witnesseth, That for and in consideration of the sum of one dollar ($1.00) in hand paid by the party of the second part, to the party of the first

part, the receipt whereof is hereby acknowledged, and under the covenants and agreements of the parties herein contained; also a certain option contract, dated April 8, 1902, signed: ' Hocking Coal Co., by E. H. Gibbs, President,' and E. H. Gibbs individually, granting unto W. A. Wells, party of the second party, certain rights for his use in buying, or causing to be bought, all the property, real, personal and mixed, owned or leased by the Hocking Coal Co. of Monroe county, Iowa, on or before June 1, 1902. As set forth in the original option contract of April 8, 1902, and of which this is a supplementary contract, as is to be attached thereto, and to become a part of the original option contract. And whereas, the said W. A. Wells did on the sixteenth (16) day of April, 1902, enter into a contract with Henry M. Blackmar, trustee of Colorado Springs, Col., for a valuable consideration, to sell to him, his heirs, or assigns all the property, real, personal or mixed of the Hocking Coal Co. of Monroe county, Iowa, and the said agreement was entered into, by and between the parties above mentioned, with the full knowledge and consent of the said E. H. Gibbs, and whereas, the said W. A. Wells is desirous of further negotiating the sale of the Hocking Coal Co.'s property, provided the said H. M. Blackmar, his heirs or assigns, does not exercise his or their rights, under the said contract between the said Blackmar and Wells, under the date of April 16; the said E. H. Gibbs hereby agrees to grant to the said W. A. Wells, an extension of fifteen days from the first day of June, 1902, on the option contract, dated April 8, 1902, which grants the said W. A. Wells the exclusive right to buy, or cause to be bought all of the rights, titles and interests of the Hocking Coal Co., real, personal or mixed. It is further agreed by the Hocking Coal Co., and by E. H. Gibbs, personally, that should the said W. A. Wells pay or cause to be paid, to the Hocking Coal Company, or E. H. Gibbs, personally, on or before June 1, 1902, the sum of four hundred and forty thousand dollars ($440,000) cash, and the said W. A. Wells does execute a deed to certain lands near Dallas, Texas, containing four hundred and forty-three (443) acres; the said W. A. Wells is entitled to all moneys paid in excess of four hundred and forty thousand dollars ($440,000) for the Hocking Coal Co.'s property, real, personal or mixed, by the said H. M. Blackmar, trustee, his heirs, assigns, or nominees, and that the said amount in excess of the $440,000 (four hundred and forty thousand dollars) is

to be the consideration for the four hundred and forty-three acres (443) of land near Dallas, Texas, as described in the alterations in figures before signing.

Hocking Coal Company.

[Seal.]                    By E. H. Gibbs, President.

E. H. Gibbs.

It will be observed that this in terms recognizes the option of April 8, 1902, and the contract made between plaintiff and Blackmar, and reduces the minimum or net price of the property from $450,000 to $440,000 and the Texas land, and provides that in case of Blackmar's failure to perform his contract the option given to plaintiff should be extended for a period of fifteen days from June 1, 1902. This latter provision concerning the extension was modified by an addendum to the writing in the following terms: " In consideration of the extension granted me this day on my option covering the Hocking Coal Company property, making said option good until June 15th, 1902, unless I have a purchaser for the property I will not exercise my rights after June 1st, 1902. (Signed) W. A. Wells." After the execution of this last writing, the defendants seem to have awaited the outcome of the proposed sale to Blackmar, until May 6, 1902, when Gibbs, being then at Oskaloosa, sent a telegram to Wells' saying: "Kalbach, President, says there is $550,000 in his bank for the property. Will parties negotiate?" This, it is not disputed, had reference to a deposit by or in the interest of Seevers or his clients. Replying to this message by telegram and by letter, plaintiff said: " If $550,000 is put in escrow payable to my order upon delivery of stock or property I will open negotiations. Must be done immediately." In his letter he further added: " If the Iowa Central people are in earnest they must make this offer immediately, as stated above, as the deal will be closed and money paid within the next few days. I have had a talk with Mr. Blackmar, and he said the offer must be guaranteed by money being placed in escrow, and he would give im-

mediate answer provided offer was made before the 8th inst.
As I repeatedly stated to you I will be very glad to assist the
Central folks in getting this property, but they must
make their propositions strictly in accordance with the
plan outlined above.  Can advise me here by wire.  If
they made this offer and placed the money in escrow, I
would suggest the Oskaloosa National Bank as trustee, and
that the above amount be paid to me or my order upon de-
livery of Hocking Coal Company stock properly assigned to
whomsoever Mr. Seevers may elect.  I really ought to know
about this before five thirty to-morrow evening.  (Signed)
W. A. Wells."  This communication was answered by Judge
Blanchard, as counsel for Gibbs, in the following terms;
" Oskaloosa, Iowa, May 6th, 1902.  W. A. Wells, Grand
Pacific Hotel, Chicago — Dear Sir:  Mr. Wing, who repre-
sents Mr. Day, the manager of the Iowa Central Railway,
was here to-day and saw Mr. Gibbs.  He claims that the
$550,000.00 was already put up in the Oskaloosa National
Bank for the purchase of the Hocking mine.  He wanted
Mr. Gibbs to go to the bank to inquire if the money was
there.  Mr. Gibbs told him that he would not go, but Guy
Woodin volunteered to go, and Mr. Kalbach, president of the
bank, told him the money was there, and they would pay the
drafts of the company to that amount for the mine.  Mr.
Wing requested Mr. Gibbs to take the matter up with you,
but Mr. Gibbs declined to do so, and told them the way was
open if they wished to make negotiations with you.  You
will see that Mr. Gibbs cannot take any steps in that line until
the question of your option is decided.  Now, if you think
it worth while to open negotiations with the Central folks
you can do so, and perhaps it will be better for you and the
parties you represent to come here and take up the matter
with them.  This, of course, is optionary with you, and I
have simply given you the information we have on the sub-
ject.  Of course Mr. Gibbs would be glad to have the mat-
ter off his hands, but does not purpose to take any steps.

acknowledging any liability to the Iowa Central, as he is not in any way liable to them. For that reason you will see that he cannot take up this negotiation." The plaintiff responded thereto, insisting upon the terms he had already stated, and saying: "It is impossible for me to bring the parties to Iowa, and if Mr. Wing cares to take the matter up he had better advise me by wire at once. I rather believe I can turn the deal to them if they act quick. . . . They can make the terms of the escrow on or before ten days from date, and if I do not deliver the property within that time they can take their money down."

From this time the deal seems to have remained in suspense until Thursday, May 29, 1902, when Wells and Blackmar came to Oskaloosa, and in an interview with Gibbs it was announced that Blackmar would not be able to carry out his contract to purchase the property, and at some time during that meeting Blackmar assigned the contract over to the plaintiff. During the same interview, at which Gibbs, his counsel, Judge Blanchard, plaintiff, and perhaps others were present, it was suggested that Seevers be approached with a view to a renewal of the effort to make a sale to him or to his client. Thereupon plaintiff and Blanchard went to Seevers' office. What took place there is the subject of sharp conflict in the testimony of the witnesses. The plaintiff testifies that he said to Seevers: "We have come to offer the Hocking property in keeping with the letter you claim to hold from Mr. Gibbs, only that you buy it of me. The price to be $550,000, $25,000 to be paid you as commission. The sale to be made by assignment of stock or bill of sale or deed." To this proposition he says Seevers replied: "Do I understand that I can buy the property in accordance with the letter I hold from Mr. Gibbs? If so, I will take it." And to this plaintiff says he answered, "Very well." Thereupon, according to his statement, Mr. Gibbs was called in, and the terms of the purchase were agreed upon, except some question of doubt or difference arose as to certain options

held by the coal company for the purchase of coal lands, and some further question as to the amount of goods in the store which the company owned, objections which it was assumed could be easily obviated. According to his testimony it was also there agreed that, instead of conveying by deed and bill of sale, that Gibbs and the other stockholders should assign to Seevers all of the capital stock outstanding; but as it was then rather late in the day, and the stock or some of it was locked in the vault of a bank, and the next day being a legal holiday, it could not be ready for delivery until Saturday, May 31st. Practically all of this testimony of the plaintiff is denied by Seevers, and in a somewhat lesser degree by Blanchard and the other witnesses present.

The question of veracity raised between the witnesses and the weight and value of their testimony respectively was for the jury alone to decide, and we shall not attempt to pass thereon. It is conceded, however, that Seevers was on this occasion informed by plaintiff or by Blanchard that the way was clear to reopen the consideration of the purchase of the property, and it is also admitted that the terms of the sale were quite thoroughly discussed, though Seevers testifies that, for various reasons affecting the title to parts of the land, he abandoned the intent to purchase, and that the deal subsequently consummated was the result of new and independent negotiations begun with Gibbs on the evening of Monday, June 2d, and concluded on the following day. On the other hand, the plaintiff insists, and his testimony has considerable circumstantial corroboration, that the negotiations begun on Thursday, May 29th, were never broken off until they culminated in the sale, and that the delay was occasioned, ostensibly at least, only to satisfy certain doubts or objections expressed by Seevers concerning a few minor collateral matters which were in fact adjusted. It is also his contention that the sale was in fact completed and the property was transferred on Monday. Whatever

1. BROKERS: options: action for compensation: evidence: question of fact.

may have been the attitude of Seevers between the close of the interview on Thursday and the following Monday evening, it is clearly shown that Gibbs and other parties in interest did not despair of making the sale, and the intervening days were utilized in removing the grounds of objections raised by Seevers.   On Saturday the plaintiff prepared a deed to Gibbs of the Texas land, and at the direction of the latter handed it to Blanchard, his counsel, to be used in closing the transaction, though Gibbs now says he did not understand the character of the paper.   On Saturday evening, for the first time so far as the record shows, Gibbs, in an interview with his attorney, disclosed a disposition to eliminate the plaintiff from the deal, and at his request Judge Blanchard prepared the following letter, which, though written on Saturday, May 31st, was dated and mailed or delivered to plaintiff on Monday, June 2d:   " Oskaloosa, Iowa, June 2, 1902.   W. A. Wells:   I wish to notify you that the proposed sale of the Hocking Coal Company to George W. Seevers has failed, he refusing to buy the property.   Under my agreement with you, your option will expire to-day.   Your written agreement with me provides that time shall not be extended unless you have a purchaser.   If you have a purchaser, such purchaser must be ready and able to pay the purchase money at once.   If that is not done by midnight to-night, I shall consider all contracts with you at an end. Hocking Coal Company, by E. H. Gibbs.   E. H. Gibbs." Blanchard also returned the deed to plaintiff by mail on Saturday; also Gibbs sent out a messenger to secure certain coal options or renewals of such options which Seevers had desired to be included in the sale, and these were obtained and brought to Oskaloosa on Monday.   On Monday evening Seevers, the president, and the directors and stockholders of the Hocking Coal Company met, and the deal was closed, or so far closed on this basis of a transfer of the capital stock instead of a conveyance of the tangible property that at the request of Mr. Seevers the president and directors of

the company resigned, and other persons designated by him were chosen to take the position thus vacated, though as a witness Mr. Seevers claims that this proceeding was tentative only, and that the purchase was not in fact perfected until Tuesday. The fact in this respect is not so clearly established as to permit the court to withdraw it from the jury, and the verdict indicates that their finding thereon was adverse to the position taken by the defendants.

The purchase price of the property, $550,000, was adjusted between Seevers and defendants in the following manner: A set-off or reduction of $10,750 was made because of the coal company's apparent lack of title to

2. SAME.

certain property or options listed among its assets, and a further deduction of $25,000 allowed as commission to Seevers, and the remainder of $514,250 was paid to Gibbs. Of this sum he set apart $165,-415.16, being substantially the amount of the debts of the Hocking Coal Company which he had assumed to pay and the margin or commission claimed by plaintiff, and deposited it in the bank payable to himself as trustee, where, so far as the testimony discloses, it still remains. To recapitulate, it appears that plaintiff held a written contract by which he could acquire the title to himself or his assigns upon performance of certain conditions at any time up to June 1, 1902, and if a purchaser was found before June 1st, the time to consummate a sale would be extended to June 15, 1902. This was an exclusive privilege, and Gibbs could not rightfully forestall plaintiff by taking on another purchaser during the life of that option. Indeed, he had expressly bound himself to assist and support the plaintiff in every way possible in making the deal with him effective. He had ratified and approved the contract with Blackmar, which did not expire until June 1st, and that contract had been assigned to plaintiff. When approached in the interest of the Iowa Central Railway Company, and told that the money was in the bank to pay for the property, he refused to treat with the

parties, and referred them to plaintiff.   On plaintiff's return, May 29th, it was still in his power to block any sale by Gibbs or the company until June 1st, or, as defendants chose to interpret the contract, until midnight of June 2d, and, possibly, until June 15th.   In this situation it was the natural and appropriate thing, when Blackmar announced his inability to carry out his contract, and turned it over to the plaintiff, for the defendants to immediately suggest that the apparent opening for a deal with the Iowa Central interests should be at once improved.   The act of Gibbs in directing or permitting plaintiff to go with Blanchard to reopen the negotiations with Seevers was an admission that he still recognized the obligation and effect of the option or contract he had given, as well as of his own express undertaking to assist plaintiff in effecting a sale.   Waiving, for the present, the appellant's objection that the consummation of the deal by the transfer of the capital stock instead of by a deed of conveyance of the tangible property cannot be treated as a performance of the contract, if this sale had been concluded in that interview with Seevers on May 29th, we are morally certain that neither Gibbs nor his counsel would be here contending that plaintiff was not entitled to his margin of profit, and this, too, without regard to whether we treat the written contract as a simple option to the plaintiff to become the purchaser, or as an aid to an oral contract of agency.   Nor can we say as a matter of law that plaintiff's demand for recovery can be avoided on the theory that the negotiation reopened by him was wholly abandoned or that such sale was accomplished independently of his agency. That, as we have seen, was a question of fact, and, so far as material, was for the consideration of the jury.   Indeed, so long as the plaintiff's written option continued in force, Gibbs cannot be heard to say that he conducted an independent negotiation with the buyer, but what he did in that behalf must be treated as referable to his agreement to use every reasonable effort to assist plaintiff in accomplishing the

sale. There was therefore no error in the refusal of the trial court to direct a verdict for the defendants.

II.    We now turn to the question whether the sale to Seevers of the capital stock of the company was a sufficient performance of the contract. It can hardly be open to dispute that whatever the parties to a contract consent to treat and accept as a performance of its conditions will so be treated by the court. *Draper v. Randolph,* 4 Har. (Del.) 454; *Gelatt v. Ridge,* 117 Mo. 553 (23 S. W. 882, 38 Am. St. Rep. 683); *Vanderbilt v. Eagle,* 25 Wend. (N. Y.) 665; *Adams v. Hill,* 16 Me. 215; *Murray v. Farthing,* 6 Mo. 251. The defendants were apparently indifferent as to the mode selected for the disposition of their coal mining interests. They desired to close out the entire corporate property, and, so far as disclosed, they had no purpose or wish to continue in control of the corporation. According to the testimony of all the witnesses, the parties, in all their negotiations, discussed the sale and transfer of the corporate property, and the matter of assignment of the capital stock was mentioned only in connection with the method of closing the deal. Judge Blanchard testifies that upon the occasion of the visit of himself and Wells to Seevers on May 29, 1902, the subject was opened by Mr. Wells inquiring of Seevers whether he wanted to buy the Hocking property, in response to which Mr. Seevers replied: "Does Mr. Gibbs want to sell me that property? Then he must talk to me about it." Mr. Seevers in his testimony speaks of the negotiations as being "for the purchase of the Hocking Coal Company property." Indeed, the parties on both sides, in speaking of the subject-matter under consideration, almost invariably used the phrase "Hocking property" or "sale of the Hocking property," and according to Mr. Seevers it was not until Monday evening, June 2d, when the negotiations had been brought to a practical close, that the subject of the method or manner of the transfer was broached. To quote from his language as stated in the ab-

3. SAME: performance of agreement.

stract:  " In the course of the interview, the question of taking the stock instead of the property was mentioned. In all of the earlier discussions and talks we had of the sale of the Hocking property, Mr. Gibbs had not asked me what kind of a title I would require."   After some discussion of the situation I said to Mr. Gibbs that " if I buy this property I do not want any conveyance at all of the property, but what I will require will be a transfer of the capital stock of the corporation to me, and will require you to guarantee to me the conditions that I have imposed in respect to the Hocking property.  .  .  .   I do not think that in the interview of May 29th we got near enough together to talk about the form of conveyance that would be required, and prior to that time I do not think it was mentioned."

It will be seen that to the minds of the parties, even upon the theory of the defendants the question whether to make a deed or assign the stock was simply a question as to the form of conveyance or kind of title with which the purchaser should be invested.  By either method, the thing which Gibbs and his fellow stockholders had so long sought to accomplish — the sale of the mine — would be effected, and they would be relieved of the responsibility of its ownership and management.  It is of course to be conceded that the sale of the property by a corporation and the transfer of the capital stock of the corporation are by no means legally identical; there is not an identity of subject-matter in the two transactions, yet either may be employed where the main end sought by both parties is to transfer from one to the other the beneficial use and control of all the assets of the corporation.   That end is, in substance, though not in strict legal effect, as fully accomplished by the transfer of the capital stock as it would be by the execution and delivery of deeds of conveyance or bills of sale.  *Boddy v. Henry,* 126 Iowa, 31.  If, therefore, the plaintiff would have been entitled to recover had Mr. Seevers chose to take an ordinary conveyance of the property, his right of recovery

will not be effected by the fact that the parties elected to take an assignment of the stock instead. Bearing directly upon this question (as well as upon the admissibility of parol evidence hereinafter discussed) is the opinion by Deemer, J., in *Oakland Cemetery Association v. Lakins,* 126 Iowa, 121, where it is expressly held that parol evidence is admissible to show that what purports to be a written contract ." has been discharged in accordance with the terms of a collateral parol agreement." And this is precisely what the plaintiff here has undertaken to do. Whether he succeeded in establishing that claim by the evidence is a question of fact and not of law.

III. It is alleged in the petition, and plaintiff swears that at the time of making the written agreement and at all times thereafter, there was an oral agreement between him and the defendant by which he was authorized to negotiate the sale of the mining property, and if he found a purchaser therefor, either upon the basis of a conveyance of the tangible property or of a transfer of the capital stock of the corporation, he was to receive the margin of the price so received over and above $450,000. This is denied by Gibbs. Counsel meet this claim of the plaintiff with the objection that proof thereof is prohibited by the familiar rule against parol testimony to vary written contracts. The existence of the rule, and its elementary character, all lawyers concede; but it is equally well settled that this rule is not available to exclude proof of a contemporaneous or collateral oral agreement as to any matter on which the writing is silent, and which is not inconsistent with its terms. *Harvey v. Henry,* 108 Iowa, 168; *Sutton. v. Griebel,* 118 Iowa, 78; *Sutton v. Weber,* 127 Iowa, 361; *Ingram v. Dailey,* 123 Iowa, 188; *Oakland Com. v. Lakins,* 126 Iowa, 121; Taylor's Evidence, section 1038; Stephen's Digest Law of Evidence, art. 90; *Graffan v. Pierce,* 143 Mass. 386 (9 N. E. 819); *Iron Co. v. Willing,* 180 Pa. 165 (36 Atl. 737); *Juillard v. Chaffee,* 92 N. Y.

4. SAME: contemporaneous oral contracts: proof.

529; *Kempsy v. Metcalf,* 61 Iowa, 320; *Stone Co v. Sheely,* 114 Iowa, 313; *Weaver v. Fletcher,* 27 Ark. 510; *Basshor v. Forbes,* 36 Md. 154; *Green v. Randall,* 51 Vt. 67; *Raynor v. Drew,* 72 Cal. 307 (13 Pac. 866); *Bonney v. Merrill,* 57 Me. 368; *Blackwood v. Brown,* 34 Mich. 4; *Cook v. Littlefield,* 98 Me. 299 (56 Atl. 899); See, also *Hinsdale v. McCune,* 136 Iowa, 236; and *Cavanagh v. Iowa Beer Co.* 135 Iowa, 682; both decided at the present term of court. 17 Cyc. 713–723; 21 A. & E. Encyc. Law (2d Ed.) 1094.

In *Cook v. Littlefield, supra,* the Maine court states the rule as follows:  " An independent verbal contract relating to the subject-matter of the writing, but not inconsistent with it, may be shown.   It does not impair or vary the written contract."   This is the doctrine of all the authorities.   We inquire, therefore, whether the oral agreement on which plaintiff relies is inconsistent with the written contract.   A single glance at the writing makes it perfectly plain that this inquiry must be answered in the negative.   The written contract and the alleged oral agreement are in no manner inconsistent.   Neither limits nor affects the operation of the other.   The written option to purchase may expire, and the oral contract to find a purchaser may continue until one or both of the parties see fit to withdraw therefrom.   But even if the writings are capable of being construed as contemplating an agency to sell the tangible property of the corporation, such an agreement is in no wise inconsistent with a separate or collateral oral agreement by which the defendants undertook to pay a similar commission for the sale of the entire body of the shares of capital stock.   The defendants may well have believed that, by offering the property for sale on either basis, a purchaser would be more readily found, and if they saw fit to confer written authority to sell the tangible property of the corporation, neither the effect nor extent of such authority would be varied in the least by giving oral authority to sell the capital stock.   That a written option to purchase and contemporaneous oral authority to sell upon

commission are not so inconsistent as to exclude proof of the latter is distinctly held by the Wisconsin court in *Reimer v. Rice,* 88 Wis. 16 (59 N. W. 450). In that case the defendant gave to the plaintiff a written option to purchase certain real property upon terms stated therein. Thereafter plaintiff brought suit alleging that he had an oral agreement with the defendant by which he was authorized to find a purchaser for the property, and to receive as his commission for such services the excess of the price thus obtained over and above the price which was named in the written option. On the trial, the defendant objected to all evidence concerning the alleged oral contract of agency on the theory that it tended to vary the written option contract. The same contention was presented on appeal. The court, in holding the objection not well taken, say: " The principle that oral evidence cannot be received to vary, alter or contradict the terms of a written contract is so elementary and well settled that it scarcely requires statement. It is a salutary rule, and one we believe that has been consistently adhered to by this court. But the rule itself suggests its limitations. It is the evidence which tends to establish an inconsistent obligation from that which is expressed in the writing which is rejected. Where, therefore, it is shown that there was an original verbal contract, and a part of it only has been reduced to writing, the rule does not apply as to the part not reduced to writing. So if the oral and written contracts are distinct and separate undertakings, though perhaps relating to the same property, the fact that one is in writing does not prevent the proof of the other by parol if it be not inconsistent with the writing." Along the line of the authorities hereinbefore cited by us, the court proceeds to say further: " If, therefore, we regard the written option as a valid contract which authorized the agent to himself become the purchaser, it is a separate collateral contract, which may consistently exist at the same time as the oral contract for the sale of the property to others on commission, and hence does not supersede or

vacate it.   If, on the other hand, we regard the option as a mere writing, not intended by the parties to become a contract, but simply to be used by the agent as proof of his authority to make sale to others, the real character of the transaction may be shown; in either case the parol evidence which was received was admissible."  ⋅ The case before us presents still stronger reasons than does the last-cited case for the application of this rule, because in the former the property which was the subject of the two contracts was the same, while in the case before us the subjects of the two contracts are not identical.   The trial court was therefore not in error in permitting proof of the alleged parol agreement,  ⋅ and, the evidence relating thereto being in conflict, there was no error in submitting the same to the jury.

A very large portion of the extended arguments of counsel on both sides is directed to a discussion of the evidence, and of its sufficiency to sustain a verdict.   We cannot prolong this opinion, already too far extended, to review these arguments.   It is enough to say, as we have already intimated, that upon all of the vital propositions in the case the evidence was in our judgment such as entitled the plaintiff to have the verdict of a jury thereon.

Other propositions mentioned in the briefs of counsel are governed by the conclusions we have already announced. We find no reversible error in the record, and the judgment of the district court is *affirmed*.

SHERWIN, J. (dissenting).— I am unable to agree with the majority opinion in this case.   Before entering upon a discussion of the legal principles involved, however, it will be well to state the case of the plaintiff as he made it in his petition and amendment thereto, for the case should be determined on the issues which the parties have themselves made.

The petition and amendments thereto allege:   That the defendants were the owners of the property in question, and desirous of selling the same.   " That, with this end in view,

the defendants entered into a contract with plaintiff whereby plaintiff agreed to use his best efforts and energies to sell the property, and in consideration of such efforts, in the event that he was successful in negotiating the sale of said property as desired, and as commissioned for such sale, the defendants agreed to pay the plaintiff " a certain amount, which has been stated in the majority opinion. " That the said agreement so entered into between the defendants and the plaintiff was partly oral and partly in writing." " That for the purpose of assisting plaintiff in making the sale of said mining property, and for the purpose of showing to prospective buyers that he had authority to negotiate such sale, and as a part of the aforesaid agreement, there was executed and delivered to the plaintiff by the defendants a certain contract or option, wherein the defendants agreed to sell to the plaintiff all the rights, title and interest of every kind," etc. " That the said contract [which was the written option above referred to] was a part of the agreement above set out, and was the only part of the said agreement that was reduced to writing." The petition then referred to the supplemental agreement which was made on or about the 18th day of April, 1902, and said " that the supplemental agreement so entered into by and between the plaintiff and defendants . . . was partly oral and partly in writing." The petition then alleged, further, that in order that the plaintiff might be able to show that he had authority to sell said property the defendants executed and delivered an option contract, etc. The petition also alleges that the portions of the contracts between the plaintiff and the defendants which were oral and not reduced to writing were made and entered into with the defendant Gibbs, who acted for himself and for the company in making the same. It is further alleged that on or about the 18th day of April, 1902, the date of the supplemental written option, the defendant entered into an oral agreement with the plaintiff, wherein he agreed that, in the event the plaintiff should procure a purchaser

" for the property of the said Hocking Coal Company, either by sale of said property directly, or through a sale of all the capital stock of said corporation,   .   .   .   then and in that event, the defendants would pay to the plaintiff commission," etc.   I quote from the petition for the purpose of showing that the plaintiff pleaded and relied on a single contract, partly in writing and partly in parol, and that his pleading does not bring him within the rule announced by the majority, that an independent verbal contract relating to the same subject-matter, but not inconsistent therewith, may be shown.

If it were true, and so alleged, that an independent written option to purchase had been given to Wells, then the position of the majority would be sound, as held by the Wisconsin court in *Reimer v. Rice,* 88 Wis. 16 (59 N. W. 450), but nothing of that kind is alleged in this case.   On the contrary, it is expressly stated and reiterated that there was but a single contract, and that the so-called options were but a blind to enable the plaintiff to negotiate a sale of the property.   And when it is once conceded that the alleged oral agreements and the so-called written options constituted but one contract, and that a contract for a commission for selling the property, it is manifest that the parol part of such contract is inconsistent with the writing, and cannot be proven under the rule which the majority concedes is so well established.   The opinion says that neither of the contracts in question " limits or affects the operation of the other.   The written option to purchase may expire, and the oral contract to find a purchaser may continue, until one or both of the parties sees fit to withdraw therefrom."   These statements are evidently based on the thought that there are two independent contracts, one in parol, and the other in writing.   But such is not the case before us.   If we may rely on the case the plaintiff has himself made and presented, the position of the majority is in my judgment wrong, and without support in the authorities cited or elsewhere.

It is a rule universally recognized that a parol collateral agreement inconsistent with the clear meaning of the writing cannot be shown. · An agreement which may be proven by parol evidence must not only be collateral, but it must relate to a subject distinct from that to which the written contract applies; " that is, it must not be so closely connected with the principal transaction as to form part and parcel of it." *Seitz v. Brewers,* 141 U. S. 510 (12 Sup. Ct. 46, 35 L. Ed. 87); *Naumberg v. Young,* 44 N. J. Law, 331 (43 Am. Rep. 380).

As I understand the opinion, the only other ground on which it justifies an affirmance is that the parties accepted the transfer of the stock as a performance of the contract. This, also, makes a new case for the plaintiff. So far as I am able to discover, he makes no such claim in argument, and he certainly made none in his pleadings. In his pleadings, as I have already said, he bases his right to recover solely on the single contract pleaded, and, in his argument, he relies on his right to prove the agreement to sell by a transfer of the stock of the corporation. He does not claim there was a waiver of strict performance and he cannot claim it in argument, because it was not pleaded.

I think there was error in admitting the parol agreement, and that the case should be reversed.