IRA ANDERSON v. W. F. THERO ET AL., Appellants.

**Negotiable instruments:** RIGHT OF ACTION BY SURETIES AGAINST
I PRINCIPAL. Where notes signed by sureties are delivered to the principal debtor with the agreement that he shall sign the same as principal before they are delivered to the payee, upon a breach of the agreement by delivering the instruments without his signa- ture the relation of principal and surety does not obtain and the debtor becomes at once liable to the sureties for the amount re- ceived from the payee; and action therefor may be instituted by

them, unless it is otherwise agreed. In the instant case the agreement relied upon is held insufficient to establish the principal's contention that his liability to the sureties did not accrue until a specific time after maturity of the notes.

**Parol evidence:** VARIANCE OF WRITING. Parol evidence of an agreement under which notes were delivered by sureties to the principal debtor for negotiation has no tendency to vary the terms of the written instrument, which does not purport to contain the terms of the collateral agreement, but simply makes reference thereto.

**Principal and surety:** RIGHTS OF SURETY. Upon failure of the principal to pay his note at maturity, and his sureties discharge the same by giving to the payee a new note therefor, to which the principal is not a party, the relation of principal and surety ceases and the sureties have a right of action against the principal for the amount of the cancelled obligation.

**Attachment:** EXCESSIVE LEVY: DAMAGES. A levy of attachment upon property subject to mortgage, with no showing of the value of the property in excess of the mortgage, will not be held excessive on appeal; and where the debtor took no steps to secure a release of the property from the excessive levy it will not be presumed that he was damaged thereby.

**Trusts:** SALE OF LAND BY TRUSTEE: LIABILITY FOR ITS VALUE. A trustee holding title to land by a quitclaim deed is only required in selling the same to realize all that he can under his title, and if the same is not marketable he should not be held for the value of an indefeasible title.

*Appeal from Van Buren District Court.*—HON. D. M. ANDERSON, Judge.

MONDAY, OCTOBER 26, 1908.

ACTION to foreclose a mortgage. Defendant interposed a counterclaim, asking damages for wrongful suing out of a writ of attachment and the negligent and improper disposal by plaintiff at much less than its value of lands held by plaintiff by way of additional security for the indebtedness. Defendant's counterclaim was disallowed, and a decree was entered in

favor of plaintiff as prayed in his petition. The defendant appeals.—*Affirmed.*

*Jamison, Elliott & Ostergard* and *Walker & Mcbeth,* for appellants.

*Work, Brown & Harlan* and *Robt. Sloan,* for appellee.

McCLAIN, J.—The mortgage, foreclosure of which is sought in this action, was executed by W. F. Thero and his wife, who is made joint defendant with him, upon property which they claimed as their homestead to secure the payment of a note for $1,500 of the same date, given to plaintiff. In fact, the note and mortgage were executed as a part of a settlement or compromise arrangement with reference to a preceding indebtedness of Thero to several persons, one of whom was the plaintiff, for money advanced or secured to be advanced by such persons to Thero in 1902, to enable Thero to resume business after having been adjudged a bankrupt. As there is no claim made in the final submission of this case that the mortgage and the note which it was given to secure were not valid and executed on good consideration, we need only consider the case on the two grounds of counterclaim relied upon by Thero: First, the wrongful, suing out of an attachment against him by plaintiff and the other persons who advanced money to him in the original transaction; and, second, the wrongful disposal by plaintiff at much less than the real value of certain Kansas lands conveyed by defendant's brother to Anderson in connection with the original transaction, with the agreement that such lands should be held by plaintiff as security to him and his associates for the money thus advanced.

I. The attachment proceeding which defendant al-

leges was wrongfully instituted was commenced in a court of Illinois against Thero as a nonresident, and under it one hundred and eighty-eight head of cattle belonging to Thero were levied upon in the county where such attachment suit was brought. After the levy upon the cattle, there were negotiations with reference to the release thereof from the levy in order that they might be sold, and, as a result, the cattle were released about two months after the levy was made and the mortgage was executed by Thero to the plaintiff. The alleged wrongfulness of the attachment consisted principally in the fact, as appellant now contends, that the indebtedness of Thero to Anderson and his coplaintiffs in the attachment suit had not yet matured.

To understand the nature of this claim, it will be necessary to set out the facts, in regard to the original indebtedness of Thero to plaintiff and the other persons who made or secured the first advancement of money to him.

In June, 1902, Thero, who then resided at Farmington, Iowa, and who had been adjudged a bankrupt, though not yet discharged in the bankruptcy proceeding, entered into negotiations with plaintiff and several other persons to become his sureties or indorsers for the purpose of furnishing or securing to him the sum of $1,500 with which to start business anew, and two notes of $750 each were drawn up payable to the order of the Farmers' Savings Bank of Farmington in one and two years, respectively, and bearing interest at the rate of seven per cent. These notes were not fully signed and delivered until July 2, 1902, when the following instrument was executed as between Anderson and Thero:

Whereas, Wm. Goodwin, S. D. Brickmore, C. T. Paisley, H. G. Kelley, J. B. Findley, E. E. Manard, and Ira Anderson are indorsers on two promissory notes bearing date June 19, 1902, one for seven hundred and

fifty dollars due in one year, and the other for seven hundred and fifty dollars due in two years; both bearing seven per cent interest and payable to the Farmers' Savings Bank of Farmington, Iowa, and, to secure said indorsers against loss on account of having to pay said notes, Ed Thero and wife turned over to Ira Anderson certain tracts of land in Greeley County, Kansas, as follows: S. W. Qr. Sec. 31; N. W. Qr. Sec. 33; S. W. Qr. Sec. 19; N. E. Qr. Sec. 20; S. E. Qr. Sec. 33; N. E. Qr. Sec. 32; S. W. Qr. Sec. 21, all in township 17, range 39, in all 1120 acres. Also to add to the above security W. F. Thero has assigned a life insurance policy in the Union Mutual Insurance Company of the State of Maine, amounting to $1,500, said policy assigned to Ira Anderson as additional security to the above indorsers and for their benefit in case of the death of W. F. Thero prior to the satisfaction of the above notes. Now, it is agreed upon the part of the undersigned, Ira Anderson, that when the above described notes are paid and fully canceled, thereby releasing the indorsers from any obligation thereon, which must be fully consummated within three years from this date, I will then transfer said described land and insurance policy to W. F. Thero, his heirs or assigns, or to any person he may designate; otherwise the same shall be utilized to satisfy all claims accruing against the above named indorsers on account of said notes and obligations.               Ira Anderson.

I hereby acknowledge the receipt of $1,500 from the Farmers' Savings Bank, the same being the amount received from the sale of the two notes mentioned in the foregoing instrument as forming a basis of an agreement between the said named indorsers and myself.

                                        W. F. Thero.

The notes, which were then delivered payable, as already stated, to the Farmers' Savings Bank of Farmington, payable one and two years, respectively, bore the signatures of the persons named in the recital of this agreement, but did not bear the name of Thero. Parol evidence was received over defendant's objection that it was the understanding and agreement between Thero and

such persons that Thero, in whose hands the notes were placed after being signed by the other persons, was to sign such notes before they were delivered to the Farmers' Savings Bank, and that, as between them, Thero was to be principal, and such other persons his sureties for the payment of such notes, and that without authority, and in violation of the agreement, Thero delivered the notes to the Farmers' Savings Bank, and received the sum of $1,500 therefor without having signed them as principal. These notes it seems were transferred by the Farmers' Savings Bank to the First National Bank, and as they fell due they were renewed by the parties whose names appeared thereon, and in October, 1904, the attachment suit in Illinois was commenced by Anderson and his co-makers to recover from Thero the principal of the original notes and accrued interest.

The contention of Thero that no indebtedness was then due from him to the signers of these notes is predicated upon a construction of the written instrument above set out, to the effect that, under its provisions, Thero was under no obligation to repay to such signers the principal and interest of these notes until after the expiration of three years from the making of the contract, and that, as the makers of the notes were sureties only for their payment, they had no claim against him until they had, in fact, satisfied the indebtedness. But the only reference in the instrument to any time beyond the maturity of the notes which Thero should have in order to extinguish his obligations to the signers thereof is contained in the stipulation that Anderson, who was receiving collateral security for the benefit of all the signers, should surrender such security to Thero when the indebtedness was canceled, which must be within a three-year period. It would be a mere inference to say from this instrument that no liability could arise from Thero

1. NEGOTIABLE INSTRUMENTS: right of action by sureties against principal.

to these signers until the end of three years notwithstanding the terms of the notes themselves by which they were to mature in one and two years, respectively: Aside from any question as to subjecting the securities, could there be any doubt that, if at the end of one and two years Thero having failed to pay the notes, the signers thereof had paid them, they would have a right to recover judgment against him in a personal action for the amounts thus paid? To justify the construction of this instrument as constituting a contract by which the signers of the notes were to have no possible right of action against Thero for three years, it ought to appear that the instrument constituted a binding contract between the signers of the instrument and Thero, but it is signed only by Anderson in his own name and acknowledged by Thero as forming the basis of an agreement between him and the signers, none of whom purports to be bound thereby, fixing Thero's liability. If without regard to the stipulations of this written instrument we find that Thero was indebted to the signers of the notes prior to the suing out of the attachment in October, 1904, there is nothing, so far as we can find, in the instrument itself to negative or disprove such indebtedness or postpone its maturity. It may well be conceded that sureties can not maintain an action against their principal until they have discharged the indebtedness; and, if Thero had been one of the signers to the notes, and such notes had been renewed from time to time by other notes signed by Thero and the others, the relation of principal and surety still continuing, unquestionably the sureties would not have been in situation to maintain an action for present indebtedness against Thero. But the relationship of principal and surety did not continue down to the time of the attachment for two reasons:

In the first place, such relationship never arose, for it is established beyond question by the evidence that

the agreement between Thero and the signers was that, before the notes were delivered by Thero to the bank, they should be signed by him. As the notes were not signed by him he did not become a debtor to the bank, and, not being a debtor, those who did sign the notes were not sureties. As between the signers and the bank the signers were principal debtors, and as between them and Thero, no such relation as that of surety to principal arose under their agreement, because the agreement had not been carried out by Thero. It is not for Thero to say that these signers were incompetent to sue him as sureties when the very act necessary to render them sureties had been omitted by him in violation of his agreement. The thing which actually took place was that money advanced by the bank to the signers on their own responsibility as makers was turned over to Thero, and in our opinion Thero at once became liable to the makers for the amount of money thus received. Having broken the very agreement under which he was to have the money for a period of time by delivering the notes without signing them, he became at once a debtor for the amount wrongfully received from the bank by him.

The contention for Thero that parol evidence of the arrangement under which the notes were delivered to him for negotiation at the bank was not admissible on 2. PAROL EVI- the ground that it tended to vary the terms DENCE: vari- of a written instrument—that is, the in-ance of writ- strument above referred to—is of no valid-ing. ity because the instrument does not purport to set out any agreement between Thero and the signers of the notes. Such agreement can only be inferred to have existed from the recitals, and such recitals do not purport to give its terms. It is too elementary to require citation of authorities that parol evidence of a collateral agreement not purporting to be in writing is not excluded by the fact that in a written instrument such collateral

agreement is recognized. See, however, *Harvey v. Henry,* 108 Iowa, 168; *Mt. Vernon Stone Co. v. Sheely,* 114 Iowa, 313; *Ingram v. Dailey,* 123 Iowa, 188; *Wells v. Hocking Valley Coal Co.,* 137 Iowa, 526; 1 Greenleaf on Evidence (15th Ed.), Sec. 285.

The second reason why the relation of principal and surety did not exist between Thero and the signers of the notes when the attachment was sued out is that, if

3. PRINCIPAL AND
SURETY: rights
of surety.

it ever existed, it was terminated when Thero failed to pay the notes at maturity. There was no evidence of any agreement that he should be bound to pay notes given by the signers in extension of the indebtedness, and, when the signers executed new notes to the bank to which the first notes had been transferred, they extinguished their liability as sureties, and, after that time, had a matured cause of action against Thero for the obligations which he had failed to discharge. It is true that the execution of a new note is not always or necessarily an extinguishment of a previously existing obligation, but, as the sureties could not bind Thero as principal by the execution of new notes to which he had not assented, these notes were executed by the makers and accepted by the bank as independent obligations, and the original notes were taken up and satisfied as effectually as though the original signers had borrowed money elsewhere with which to extinguish such notes.

In no view of the case we think can it be said that, when the attachment proceeding was commenced, the original signers who instituted such proceeding had not actually a matured claim against Thero for the amount of the original notes, with interest thereon, and therefore in this respect the attachment was not unseasonable.

Something is said in argument as to an excessive levy under the attachment; that is, a levy on a larger amount of property in value than necessary to satisfy

the indebtedness, to Thero's damage. But the cattle
levied upon were already subject to a mort-

4. ATTACHMENT:
excessive levy:
damages.

gage, and we have no means of knowing
that their value was greatly in excess of the
amount of the indebtedness when the amount of
the mortgage was taken into account. Moreover,
there is a provision in this State, and we must pre-
sume that there is similar provision in Illinois, by which
the debtor may secure release of property from an exces-
sive levy. As it does not appear that Thero asked any
such relief in the proper court, we can not assume that
he was legally damaged by the levy which was made.

The trial court, therefore, properly held that Thero
had no legal basis for a counterclaim for damages against
the plaintiff in this action on account of the attachment
proceeding in Illinois.

II. As to the alleged breach of trust by plaintiff
in disposing of the Kansas lands at an inadequate price,
which is made the basis of the other division of de-

5. TRUSTS: sale
of land by
trustee: liabil-
ity for its
value.

fendant's counterclaim, the facts are briefly
as follows: The defendant procured his
brother Ed. Thero to convey to plaintiff
by quitclaim deed seven quarter sections of land in Greeley
County, Kan., to which Ed. Thero held apparent titles
by tax deeds. On various dates from August, 1905, to
March, 1906, Anderson made quitclaim deeds for these
different tracts to various parties, receiving small sums
in consideration, in all about $350, which was credited
to defendant on an unsecured note for $500 given by de-
fendant to plaintiff as a part of the settlement in De-
cember, 1904. Evidence was introduced for defendant
tending to show that these lands were worth from $5 to
$6 per acre at the time they were thus disposed of by
plaintiff; but, in determining whether plaintiff realized
all that he should have realized as trustee by the sale of
these lands, we are not concerned with the value of the

lands held under a fee-simple title, but only with the reasonable value of the title which had been conveyed to plaintiff, and which he was holding as trustee. Plaintiff had merely a quitclaim deed from the holder of tax titles. If these tax titles were not valid, or if they were not marketable, he should not be held liable for the value of a valid marketable title. As a matter of fact, defendant had in July, 1905, through his attorney, advised plaintiff as to two of these quarter sections that it would be useless to fight suits to set aside the tax deeds, and asked him to make quitclaim deeds for a small amount corresponding, as we understand it, substantially to the sum necessary to redeem from the tax titles on the theory that the tax deeds were invalid. Thero explains this letter by saying that as to the other five quarter sections he had contracts with the owners by which he could perfect and make valid and indefeasible his brother's tax titles on the payment of additional sums to such owners, which sums he was subsequently unable to pay on account of financial embarrassments. But in so claiming defendant concedes that his tax titles were not good and indefeasible. He thereby recognizes the fact that more money must be invested to make the titles good, and, as plaintiff was under no obligation as trustee to make any further investment, he ought not to be held liable for the actual value of the land on the theory that he had good and indefeasible title thereto. Plaintiff should be held liable only for the value of the tax titles. It tends to show that he sold them for all that they were worth.

The statutes of the State of Kansas and some of the decisions of the Supreme Court of that State were introduced in evidence for plaintiff to show that some of the taxes for which these lands had been sold were invalid, and that the invalidity of the taxes rendered the deeds likewise invalid and subject to be set aside. Without going into these questions at length, it is suffi-

cient to say that there was such doubt about the validity of the tax titles as to render them practically of little value, and defendant has not shown that, in view of the uncertainty of these titles and their consequent unmarketable character, they could have been sold by plaintiff for more than he got for them. Plaintiff as trustee was under no obligation to incur the expenses of litigation which if he had been defeated could not have been recovered by him from defendant; nor was plaintiff under obligation to wait until judgments had been rendered against him declaring the tax titles invalid, for suits were threatened as to all the titles, and it was his duty to realize all that he could. Defendant was well advised as to the situation, and, if he had desired to protect these titles, he should have taken the steps to do so at his own expense. All that he did was to encourage plaintiff to make a fight, and, as plaintiff had not assumed any obligation to conduct lawsuits in defendant's interest, he was justified in doing the best he could to realize money out of the titles without the incurring of additional expense. As already indicated, there is no evidence, save that as to the actual value of the land, to indicate that plaintiff did not do all that a reasonably prudent man could do under the circumstances to realize the full value of the rights which he held. On the contrary, all the evidence there is on the subject is to the effect that plaintiff got all that anybody could have got out of these titles. This ground of defendant's counterclaim must fall for the want of evidence, for the burden is, of course, on defendant to show negligence or misconduct of plaintiff to defendant's damage.

The trial court was right in disallowing defendant's counterclaims, and the judgment and decree of foreclosure entered in plaintiff's favor are *affirmed*.