UNION STATE BANK, Trustee, and R. THEWS ET AL. v. AMERICAN
SURETY COMPANY, Appellant.—23 S. W. (2d) 1038.

Division One, February 3, 1930.

*Langworthy, Spencer & Terrell* for appellant.

440

■■■■■■■■■■■■■■■■■■■■■■■■■

*Trusty & Pugh* for respondents.

■■■■■■■■■■■■■■■■■■■■■■■■■

LINDSAY, C.—This is a suit upon a bond given by the Associated Mill & Elevator Company, hereafter called the Elevator Company, as principal, and the American Surety Company as surety, to Union State Bank of Beverly, Kansas, as trustee, for the benefit of the individuals joined as plaintiffs, respondents here. The bond was given to secure the performance by the Elevator Company of the terms of a written contract entered into by the Elevator Company, and the Union State Bank as trustee, on behalf of the named individuals, for the building of a grain elevator at Beverly, Kansas. The Elevator Company is not a corporation, but is a common-law trust. It was engaged in the business of building elevators. Under the plan it pursued, the sum required for the construction of an elevator was procured through subscriptions made by individuals residing in the locality of the proposed elevator, who, for payment of their subscriptions, received from the Elevator Company certificates of stock in the trust estate. In the case at bar, representatives of the Elevator Company prior to November 15, 1920, had solicited and procured subscriptions, from the individuals herein joined as plaintiffs, and one other, in the total amount of $6,900. The payments upon these subscriptions were made to the Union State Bank, to the end that the bank might contract on behalf of the subscribers. Although only the sum of $6,900 had then been subscribed, the plan was that the sum of $8,000 should be raised, to be paid to the Elevator Company for the construction of the elevator, which, according to the plan, was to be completed ready for crops maturing by July 1, 1921. By way of preface, it may be said that the contract here in question was entered into before the amount of $8,000 was subscribed, when only $6,900 had been subscribed, and

the bond sued on was delivered at the time the contract was signed by the bank and the Elevator Company. It may further be said at this time that the full sum of $8,000 was never paid to the Elevator Company. That company, before this suit was brought, had become insolvent, and its affairs were in the hands of a receiver. No work on the construction of the elevator was ever done. This suit is for the recovery of money paid to the Elevator Company by the bank, which the bank received as trustee for the subscribers, and for which the Elevator Company had issued certificates of stock. A subscription, and payment, of $300 was canceled by an arrangement between the subscriber and the Elevator Company. The suit is for the recovery of the sum of $6,600, and accrued interest. The plaintiff had judgment for the total sum, principal and interest, of $8,-218.10, and defendant appealed.

The trial was had without a jury, and most of the evidence was taken under the first amended petition of the plaintiff and the amended answer of defendant. After an interval of several months, further evidence was taken, and plaintiff filed a second amended petition, and defendant filed a second amended answer. These pleadings are long, but in view of the questions presented on appeal they need not be set forth extensively, and they will be referred to as occasion requires in the discussion of the questions raised.

The defendant makes nineteen assignments of error, but all the contentions made under his "points and authorities," and in the discussion in the brief, are directed to the claim that the court should have sustained defendant's demurrer to the evidence. This claim that the demurrer to the evidence should have been sustained is put upon the several grounds: (1) That the bond sued on was not shown to have been written on the contract executed by the Elevator Company and the Bank; (2) that on December 16, 1920, the bank and the Elevator Company entered into a new agreement modifying the terms of the written contract, by reason of which, the Surety Company was released on its bond; (3) that the bond never became operative, because, the bank, as acting for the subscribers, never fulfilled its obligation to the Elevator Company under the terms of the contract and bond, that is, never paid the sum specified, $8,000; that the Surety Company did not waive the failure of performance by the bank of its contract with the Elevator Company.

The primary step is to determine whether the Surety Company insured the performance by the Elevator Company of the contract pleaded in the petition, and if so, next, to determine whether it is liable under the terms of that contract and the conditions of the bond, in view of the facts shown in evidence.

The testimony for plaintiff shows that in November, 1920, the Elevator Company, by its vice-president, Mr. McQueen, presented

to the bank the proposed contract in writing already signed for the Elevator Company by its president; but no bond was tendered by the Elevator Company at that time. The proposed contract as thus written and presented, contained the following provision:

"Of the amount subscribed sixty per cent shall be placed on deposit in the Union State Bank of Beverly, Kansas, in the name of the second party and shall only be used in the payment of obligations incurred in obtaining a site, payment for bills for material, insurance, plans and specifications, and like obligations incurred in the construction of such elevator and the equipment thereof until ready for use. The second party shall approve the bills payable from such fund before they are paid, and second party's checks upon such fund shall only be paid by the said bank upon the approval of such bills by the second party. The remaining forty per cent of funds derived from such subscription shall be delivered to the second party."

This provision was objected to by Mr. Schroeder, cashier of the bank, and by the attorney for the subscribers, on the ground that no bond was required before the money was paid over, and it was insisted that the provision quoted should be changed, or stricken out, and another provision substituted therefor requiring a bond to be given before the money should be paid to the Elevator Company. As we understand the testimony, the form of the provision so to be substituted, was prepared by the attorney for the subscribers. About the 16th day of December, 1920, the vice-president of the Elevator Company returned, bringing the proposed contract and the bond sued on, the contract being the same instrument before tendered, except that the clause objected to and quoted above had been stricken out by drawing lines in ink over the words in that clause, and the substituted clause appeared therein in typewriting. As thus drawn, the contract was signed for the subscribers by the bank through its cashier, and the bond was accepted as written, except that by consent obtained at that time from the Surety Company, the bond was so changed as to provide for a completion of the elevator for crops "maturing in the season" of 1921 instead of "maturity after July 1, 1921." The contract as declared upon in the petition as the one entered into between the Elevator Company and the bank, and for the performance of which the bond was given, omitting signatures, is now set forth, the clause therein appearing substituted for the clause eliminated, being shown in italics:

"AGREEMENT.

"Whereas, it is desired by the citizens of Lincoln County, Kansas, residing in and in the vicinity of Beverly, Kansas, and by the Associated Mill & Elevator Company that a modern grain elevator

with a sufficiently large number of small bins to care for the various kinds and grades of grain grown in territory tributary to Beverly, Kansas, of a capacity of ten thousand bushels, be erected at Beverly, Kansas, on or near the railroad right-of-way, and that the sum of eight thousand ($8,000) dollars be subscribed and paid by the citizens of such county residing in territory tributary to Beverly, Kansas, for shares in the company, of the par value of $100:

"Now therefore, it is agreed by and between the Union State Bank, of Beverly, Kansas, as trustee for the subscribers for such shares, and subscribers who attach their names hereto or become parties hereto by subscribing for such shares, as first parties, and Associated Mill & Elevator Company, second party, as follows:

"Whenever the sum of $8,000 shall have been paid by subscribers for such shares into the Union State Bank of Beverly, Kansas, the second party shall proceed with reasonable diligence to acquire a site for such elevator and will commence and prosecute to completion the construction thereof at Beverly, Kansas, so that the same may be completed in time to receive the grain crops maturing after July 1, 1921, strikes, lockouts, acts of Providence, conditions of war and of the elements excepted.

"*Before any part of said $8,000 shall be paid over to said second party it shall furnish a bond in some reliable Surety Company, that the conditions of said contract will be carried out and said elevator built according to contract (and upon the deposit of said bond with said Bank as Trustee, then the full amount of $8,000 shall be paid to said second party). The said surety bond to contain in substance the terms of this contract.*

"Second party will give bond in the sum of $8,000 that they will comply with the terms of this contract and erect such elevator in a good and workmanlike manner within the time limited, such bond to run to the Union State Bank Trustee of Beverly, Kansas, for the benefit of all subscribers to such shares under this contract and shall be deposited with such bank.

"The second party is to use every effort to begin the construction of such elevator at the earliest practicable date and to complete the same within the time limited.

"Whenever $8,000 of such subscriptions under this contract shall be paid into the Union State Bank of Beverly, Kansas, the parties making such payments shall then be entitled to have issued and delivered to them the certificates for shares in the Associated Mill & Elevator Company for which they have subscribed and paid. All sums received from subscriptions over and above $8,000 shall be paid to the second party.

"In witness whereof the parties have hereunto signed their names this 15th day of November, 1920."

The bond, omitting signatures, is as follows:

"BOND.

"Know All Men by These Presents: That we, Associated Mill & Elevator Company, a Trust Estate, as Principal, and American Surety Company of New York, a corporation of the State of New York, as Surety, are held and firmly bound unto the Union State Bank of Beverly, Kansas, Trustee, in the full and just sum of Eight Thousand and no/100 Dollars ($8,000), for the payment of which, well and truly to be made, we do hereby bind ourselves, our successors and assigns, jointly and severally, firmly by these presents.

"Dated this 2nd day of December, A. D. 1920.

"The Condition of the Above Obligation Is Such, that whereas, on the 15th day of November, 1920, the said Associated Mill & Elevator Company entered into a contract with the Union State Bank of Beverly, Kansas, as Trustee, for certain subscribers to the stock of the Associated Mill & Elevator Company, wherein it was agreed for said Associated Mill & Elevator Company to build a modern grain elevator suitable for the various kinds and grades of grain grown in territory tributary to Beverly, Kansas, said elevator to be of a capacity of at least ten thousand (10,000) bushels and to be erected at Beverly, Kansas, on or near the railroad right-of-way, said agreement on the part of the Associated Mill & Elevator Company being predicated and conditioned upon the subscription and payment of, by citizens of the territory tributary to Beverly, Kansas, the sum of Eight Thousand Dollars ($8,000), for which said subscribers are to receive certificates for shares of beneficial interest in the Associated Mill & Elevator Company to the amount of Eight Thousand Dollars ($8,000), each share of such beneficial interest being of the par value of One Hundred Dollars ($100); and,

"Whereas, the subscribers as aforesaid, desire to be guaranteed that the elevator as hereinbefore described would be built in accordance with the agreement hereinbefore referred to, so that it would be constructed and completed in time to receive grain crops maturing in the season of 1921, strikes, lockouts, acts of Providence, conditions of war and of the elements excepted.

"Now, Therefore, If the said subscribers shall pay to the said Associated Mill & Elevator Company the said sum of Eight Thousand Dollars ($8,000), and if the said Associated Mill & Elevator Company shall construct said elevator in accordance with the terms and conditions of said agreement and in the event the Elevator Company shall not construct said elevator as agreed upon and shall return to the said Trustee for the benefit of the said subscribers the amount subscribed by them, not exceeding the sum of Eight Thou-

sand Dollars ($8,000), for distribution upon surrender by said subscribers of respective certificates of beneficial interest in Associated Mill & Elevator Company, held by them to the said subscribers in such proportion as the subscriptions have heretofore been made and paid in to said Trustee, then this obligation shall be null and void; otherwise to be and remain in full force and effect.''

Coming now to the first contention of defendant: It is urged that the contract was declared upon as dated November 15, 1920, and was so dated, but that it was not executed until December 16, 1920; that the bond is dated December 2, 1920, and refers to the contract as one entered into on November 15, 1920; that the contract showed erasure of paragraph Four as originally written, and the interlineation of a different provision, and that it was not shown that the defendant executed the bond subsequent to the time the paragraph was stricken out and the other paragraph interlined. It is true that it was not shown what person made the erasure and the interlineation, nor the particular date when that was done. As indicated above, it was shown that the paper writing first tendered was taken to Kansas City, by the vice-president of the Elevator Company in response to the objection that paragraph Four was not acceptable, and should be replaced by one to be inserted, and that the bond was to be given in accordance with the new provision as a condition precedent to the payment of the money to the Elevator Company. When the bond was executed by the Surety Company, it was given to the representative of the Elevator Company, and evidently given to him to be delivered to the bank, upon the signing of the contract. In the first amended petition it is alleged that on or about the 15th of November, 1920, the Elevator Company and the bank entered into a contract, ''which contract had been originally prepared and signed by said Mill Company on or about November 15, 1920.'' It was also alleged in the petition that the Elevator Company agreed to furnish the bond of a reliable surety company guaranteeing that the conditions of said agreement would be carried out, ''and that the terms of said surety bond should contain in substance the terms of the contract.'' It may be observed at this point that the language just quoted is language used in the fourth paragraph of the contract substituted in place of the one erased. The amended petition also alleged that the Elevator Company on the 16th day of December, 1920, did furnish the bond of the defendant Surety Company, and that a copy of the bond was attached to the petition as ''Exhibit B.'' The copy attached to the petition sets forth the bond as containing the substituted paragraph Four. The defendant by its first amended answer upon which the trial was begun, in September, 1923, ''admits that the contract set out in the amended petition

. . . dated November 15, 1920, was entered into'' and further admits the execution of the bond on the second day of December, 1920. This answer was put in evidence. When the cause was taken up for an additional hearing in July, 1925, defendant filed its second amended answer. In that answer defendant first had the admission as contained in its first amended answer just above referred to, but later struck out the admission and interlined in lieu thereof the statement that a contract dated November 15, 1920, was executed on or about that date, between the Elevator Company and the bank, and that defendant executed its bond on December 2, 1920, based upon a contract then presented to it, entered into on November 15, 1920, between the Elevator Company and the bank ''and not upon the basis of any other contract.'' It is significant that the defendant, by its pleading, twice admitted that the contract set out in the amended petition dated November 15, 1920, was entered into. It further appears in the record that the Surety Company had received a copy of the contract as it was written and upon which the bond was given; and in response to a request that such copy be produced, replied that defendant's copy of the contract had been mislaid. The original written agreement was admitted in evidence without objection on the part of defendant. There was no claim made then that the alteration by erasure and interlineation, had been made after the defendant executed the bond. The bond became effective on its delivery on December 16, 1920. The trial court necessarily found that the bond was written upon the contract as shown in the instrument received in evidence. Such a finding was warranted and the objection made here, founded upon the dates recited in the contract and bond, and on the erasure and interlineation, appearing in the writing, is overruled.

The next questions raised by the defendant, (a) whether the bond became operative upon delivery, and (b) whether, after delivery of the bond, the parties, the Elevator Company and the bank, entered into a new agreement changing the terms of the contract, and if so, whether defendant waived failure, if any, of performance by the bank, require a consideration of the evidence concerning what was done at and after delivery of the bond. The testimony shows that on the delivery of the bond, Mr. McQueen, vice-president of the Elevator Company, asked that the amount subscribed and paid to the bank, $6,900, be then turned over. The cashier said he demurred, and hesitated to do this, because the full amount of $8,000 had not been subscribed. McQueen stated that if the bank would pay over the $6,900, he would see that the balance of the subscriptions were obtained, and also said the building of the elevator would be begun as soon as the weather conditions permitted. The bank cashier consulted Mr. McFarland, attorney for the subscribers, concerning the advisability of making

this payment, who thought it would be all right to make the payment, if the Elevator Company agreed to obtain the balance of the subscriptions. The bank turned over to McQueen a certificate of deposit for $6,272, bearing four per cent interest and maturing in six months. This was the proceeds of $6,400 paid to the bank by the subscribers, less $128, a commission of two per cent which the Elevator Company had agreed should be retained by the bank for handling the matter. The bank had taken the notes which the subscribers gave to the agents of the Elevator Company in payment of the shares to be given them. At the same time, there was turned over to McQueen Liberty bonds in the amount of $500, which had been delivered to the bank in payment of subscriptions. There is no testimony showing when the Surety Company was informed of this payment. The cashier of the bank testified that at the time, owing to financial conditions, Liberty bonds were not selling at par and also, that the certificate of deposit was not salable at par. However, the Elevator Company gave its receipt for the full amount, and apparently accepted the certificate and Liberty bonds as payment. It was after this that the Elevator Company cancelled the $300 subscription of one of the stockholders who was dissatisfied, and returned to that stockholder the amount paid on her subscription. The Elevator Company took no steps to secure additional subscriptions, and took no steps toward the building of the elevator. On May 21, 1921, Mr. McFarland, the bank's attorney, wrote to inform the Surety Company that nothing had been done toward the building of the elevator. On May 24th, Mr. Zimmerman, a vice-president, and the manager of the office of the Surety Company at Kansas City, wrote to the bank, and referring to the letter received from Mr. McFarland, stated that the Elevator Company "intimated" that $8,000 had not been subscribed, and asked to be informed by the bank what was the situation. The cashier of the bank again conferred with Mr. McFarland, who advised that subscriptions to complete the $8,000 should be raised, being of the opinion that the Elevator Company was not obliged to proceed to construct the elevator until the balance of the subscriptions were made and paid. On May 28th, the cashier of the bank procured five of the then stockholders to pay into the bank the additional amount of $1,400, to be held by the bank until the Elevator Company should issue to them stock for the same. The cashier testified that about May 30th, he informed the Elevator Company over the telephone that the subscriptions were completed, and gave the names of the parties to whom stock should be issued to the amount of $1,400. On May 30th the Elevator Company wrote to the bank, claiming there was $1,900 yet to be subscribed and paid, saying in the letter it had not accepted $6,100 as full payment under the contract. The testimony

fails to explain what the Elevator Company meant by saying that they had received only $6,100. That the Elevator Company had received the certificate of deposit for $6,272, and Liberty bonds in the amount of $500, was beyond question. The testimony shows that the Elevator Company sold the certificate of deposit, but what it received either for the certificate of deposit or for the Liberty bonds is not shown. On May 31st, the Elevator Company wrote to Mr. McFarland, in answer to a letter from him dated May 21st, and referred to his statement that the elevator might not be completed in time for harvest. In that letter the Elevator Company also claimed that the amount paid in to date was only $6,100, but suggested in said letter that if the subscribers would prorate the remainder of the $1,900 among themselves, then as soon as this was done, the Elevator Company would rush the work, and carry out its part of the contract as quickly as possible. On June 9th, the Surety Company manager wrote Mr. McFarland, referring to Mr. McFarland's letter of May 21st, and saying he had been told by the Elevator Company that the farmers had not kept the contract, and the amount of $8,000 had not been subscribed. About June 9th, the bank, by the cashier, Mr. Schroeder, sent a certificate of deposit for $1,078 to Mr. McCanles, an attorney in Kansas City, to be by him delivered to the Elevator Company, as payment of the balance of the subscriptions. This certificate, as explained by Schroeder in his testimony, was intended to represent the $1,400, less a commission of fifteen per cent to him, for obtaining the subscriptions, and a two-per-cent commission to the bank. The amount of the sum tendered, however, represented a deduction of more than seventeen per cent. The Elevator Company refused to accept the offered certificate. It was payable six months after date with interest at four per cent. On June 23rd, a second certificate of deposit was drawn by the bank payable to the Elevator Company in the amount of $1,372, which also was forwarded to McCanles for delivery to the Elevator Company in payment of the stock to complete the subscription. The Elevator Company refused to accept this, because of the two-per-cent discount, and it appears also that the certificate was not signed. On June 28, 1921, the attorney for the Elevator Company wrote to Mr. McCanles, saying that the $1,400 should be sent in full and by bank draft. About the middle of July, 1921, Mr. Schroeder, the cashier, and Mr. Kissick and Mr. Thews, two of the subscribers, and also Mr. McCanles, the attorney mentioned, called upon Mr. Zimmerman, the manager of the Surety Company at his office in Kansas City. The four persons named testified that in their talk with Mr. Zimmerman they informed him they had the $1,400 in the bank at Beverly to complete the subscriptions. The testimony indicates that at this time there was in the minds of these

persons, and especially of Mr. Zimmerman, a belief or suspicion that the Elevator Company was not solvent, or able to carry out its contract. This talk occurred about the middle of July. It was agreed upon the trial that the receiver for the Elevator Company was appointed on July 21, 1921. The testimony of Schroeder, Kissick, Thews and McCanles was that in this conversation, Mr. Zimmerman stated that he did not think the money mentioned should be paid to the Elevator Company unless they were sure the company would complete the elevator. The witness Kissick testified that Zimmerman was asked whether the $1,400 should be returned, or delivered to the Elevator Company, and Zimmerman said, "No," they "should hang on to the $1,400," and saying: "You had better not give it to them, because it looks as though they are not going to build the elevator. We will lose more than we will this way." Zimmerman said he was glad the balance had not been paid. The evidence is that the Surety Company received a premium of $80 for executing the bond, which it retained, and made no offer to return the same. There is no testimony that in any letters, or any of the conversations referred to in the testimony, the Surety Company made any claim that the bond was not in force, or that it had been released by any change of the contract, or failure of the bank and the subscribers to conform to the terms of the contract.

In considering the questions raised by defendant there must be kept in mind certain rules governing in cases wherein the surety executing the bond is engaged in that business for a compensation. It is the rule in this and in practically all jurisdictions that in the case of a surety company acting for a compensation, the contract will be construed most strongly against the surety and in favor of the indemnity provided for by the contract; and also, the courts in following that rule regard such a contract as one of the nature of an insurance contract and as so to be construed. [Lackland v. Renshaw, 256 Mo. 133; State to use v. Cochrane, 264 Mo. 581; Fidelity & Deposit Co. v. John Gill & Sons Co., 270 S. W. 700; Rule v. Anderson, 160 Mo. App. 347; Bank of Deepwater v. Ogden, 192 Mo. App. 243; Police Relief Assn. v. American Bonding Co., 197 Mo. App. 430; 21 R. C. L. 1162, 1163; 32 Cyc. 306; 12 A. L. R. 382 (Annotation).]

Of course, the foregoing is a rule of construction of contracts of this character. It is not a rule which holds the Surety Company beyond the plain terms of its contract, or, if the contract be ambiguous or uncertain, beyond the limits of a reasonable construction favorable to the obligee, in view of the circumstances attending the making of the contract.

It is contended that the bond did not become operative, because, the whole sum of $8,000 was not paid, and that the turning over of

450

only $6,900 at that time was in violation of the terms of the contract and the bond, which left no obligation under the bond. The other contention is, that the turning over of the $6,900 was pursuant to a new contract, or, an unauthorized change of the contract, and it rests upon the same premise as the other, that liability did not attach upon payment of a part. The contract and bond are to be construed together, but, the terms of the bond must not be lost sight of nor their governing control destroyed. The makers of this bond assumed to construe the agreement of the Elevator Company, by stating in the bond, that it is "predicated and conditioned upon the subscription and payment of, by citizens of the territory tributary to Beverly the sum of $8,000, for which the subscribers are to receive certificates for shares of beneficial interest in the Elevator Company." The bond in its final and defeasance clause, states two alternatives under which the surety would not be liable. There is no liability if the Elevator Company shall construct the elevator according to the contract. The other alternative of no liability stated, is, that if the Elevator Company "shall not construct the said elevator as agreed upon, and shall return to the said trustee for the benefit of the said subscribers the amount subscribed by them not exceeding the sum of $8,000 for distribution upon surrender by said subscribers of the respective certificates of beneficial interest in Associated Mill & Elevator Company, held by them, to the said subscribers in such proportion as the subscriptions *have heretofore been made and paid in* to said trustee," then there is no liability. This reference is to subscriptions paid to the trustee. The bond was executed and delivered when only $6,900 had been subscribed and paid, so that, speaking as of the time of its delivery, and using the word "heretofore," it refers to subscriptions which had been made and paid in to the trustee before the execution and delivery of the bond. There is not a word of oral testimony from which it can be said that the officials of the Surety Company either knew or did not know how much had been subscribed and paid in at the time of the execution of the bond. Yet, despite the other and preceding conditions in the bond, and the conditions in the contract, the bond contains this special reference to subscriptions "heretofore" made and paid. The contract in its provision that "whenever," that is "at whatever time," the sum of $8,000 shall have been paid into the bank, the Elevator Company was to proceed, carried the inference that all of the $8,000 might not have been paid at the time of the execution of the contract, but the Surety Company executed the bond, and gave it to the Elevator Company to deliver. The bond, by its last clause contemplates the event that the Elevator Company might not construct the elevator, and not doing so, might not return the money, already paid in at the time of the execution of

the bond, and the surety, by the last clause of the bond recognizes or assumes responsibility for return of payments made before the execution of the bond, and not returned by the Elevator Company. Indeed, in respect to return of payments, the bond, literally, seems to restrict the surety's liability to return of the payments made before the bond was executed. If it was intended in that clause that the Elevator Company would be under no obligation to proceed, and the bond would not be operative until the whole sum of $8,000 was paid, why was the word "heretofore" used? There is no claim that the Elevator Company in applying for the bond represented that all of the $8,000 had been subscribed and paid. The least that can be said of the language used in the final part of the bond, would be that it introduced into the bond an ambiguity. If it did so, under all the authorities dealing with the bonds executed by securities for hire, that construction must be given which is most favorable to the obligee and which reasonably may be drawn in view of the language used and of the existing circumstances. The provision under consideration referred to a condition of fact as then existing, and at that time, the $6,900 had been paid in, and no more. The suit is for the recovery of the very payments which had already been made at the time the bond was executed.

We refer again to that part of the clause under consideration, the provision that if the Elevator Company shall not construct the elevator as agreed upon, and shall return to the trustee the amounts subscribed "not exceeding the sum of $8,000 . . . in such proportion as the subscriptions have heretofore been made and paid in to said trustee," the obligation was satisfied. In this connection attention is called to the last clause of the contract itself, which contains the provision: "All sums received for subscriptions over and above $8,000 shall be paid to the second party." Taking these writings together the bond is susceptible of the construction that it was contemplated by the Surety Company, that when the bond should be delivered, there might be either more or less than $8,000 subscribed and paid in. If more, the Surety Company would not be liable for the subscriptions and payments made in excess of $8,000. If equal to or less than $8,000, the Surety Company undertook to return those already made when the bond was delivered, if the Elevator Company did not construct the elevator, or did not itself return those subscriptions. The obligation of the Surety Company was drawn by its own officers, and in case of any uncertainty, that construction is to be adopted which is most favorable to the obligee.

The language used by the Surety Company is not to be construed so as to make the subscription and payment of the full sum of $8,000 a condition precedent to any liability on the part of the Surety Company, or as an avoidance of liability for the repayment of money

already paid by subscribers, in the event the Elevator Company did not build the elevator and did not make such return. The subscribers who had already paid in the amounts of their subscriptions, a total less than the $8,000, were not under any legal obligation to pay more, and the terms of the contract and the conditions written into the bond are a recognition of this.

The recitals in the contract and bond disclose the making of a tentative plan, for the building of an elevator by the trust estate, to be its property, if subscriptions should be "made and paid by citizens of the territory tributary to Beverly" to the amount of $8,000; and the paying subscribers were to receive certificates for shares of beneficial interest in the trust estate. The language used by the Surety Company in the bond in view of all the recitals made and referred to, and in view of the circumstances existing at the time the bond was delivered, is susceptible of the construction that the Surety Company intended to bind itself to make return of the payments made at the time the bond was delivered, if the plan failed, through failure to obtain the necessary subscriptions and payments, or through failure of the Elevator Company to construct the elevator, and failing to do so, also failing to return the payments made at the time the contract and bond were executed and delivered.

Counsel for defendant urge that the payment of the $6,900 and failure to pay the whole sum of $8,000 at the time of the delivery of the bond, violated the contract and under the circumstances shown constituted a new agreement, under which there is no liability whatever on the part of the surety, and have cited cases involving the change of the agreement between an obligee and a principal without the consent of the surety. We think these cases are not controlling, under the terms of this bond, and the circumstances existing when it was delivered. We think it presents a case wherein the rule is applicable that the surety cannot make a defense which could not be made by the principal. "Ordinarily, whatever estops the principal, estops the sureties." [State ex rel. v. Blakemore, 275 Mo. 1. c. 706.] "The sureties can ordinarily make no defense that could not be made by their principal. The measure of his responsibility is the measure of theirs, and any act of the principal which estops him from setting up a defense personal to himself operates equally against his surety." [21 R. C. L. 999.] In this bond the Surety Company, reciting the condition that if the subscribers should pay to the Elevator Company the sum of $8,000, yet, so farther framed the bond, as to make the subscriptions already "made and paid in to the trustee" a measure of its obligation. Under the circumstances shown, the principal in the bond could not have made as a defense, the payment of only $6,900 at the time the bond was delivered, nor can the Surety Company successfully do so.

The Elevator Company waived the requirement of payment of the full sum of $8,000 upon the deposit of the bond. And the Surety Company, after stating the payment of $8,000 as a condition not existing, but as an act to be done, follows that by fixing as the proportion or measure of its liability, "the subscriptions heretofore made and paid in to the Trustee," and thereby in effect waived beforehand compliance with the requirement of payment of the full sum upon deposit of the bond.

It is contended that by the terms of the bond, payment to the Elevator Company was to be made in money, and that the acceptance by the Elevator Company of the Liberty bonds and the certificate of deposit, with retention by the bank of two per cent commission upon $6,400 was not a payment under the terms of the bond, and was a direct violation of those terms. The nature of the transaction is to be borne in mind. The Elevator Company procured the subscription and took the notes of the subscribers therefor. It did not hold the notes for collection, but transferred them to the bank. It took the Liberty bonds and the certificate of deposit issued by the bank as payment and satisfaction of the obligations of subscribers to the extent of $6,900. The recitals in the bond show that its primary purpose was the assurance of an indemnity of the subscribers in the event the Elevator Company neither constructed the elevator, nor returned to these subscribers the amount of their subscriptions. So far as concerns the Elevator Company these subscriptions to the amount of $6,900, were made and paid in to the trustee, the bank, when the bond was delivered. Acceptance by the Elevator Company of the Liberty bonds and certificate of deposit as in full of the subscriptions, when and as the bond was delivered, was payment to the Elevator Company. The Elevator Company in its final contention did not claim that more than $1,400 was due upon the subscriptions made by the existing subscribers. The Elevator Company could not successfully make the defense here under consideration, and we hold that the surety cannot.

The judgment is affirmed. *Seddon* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.