Vern **ROBSON**, an individual, doing business as Sac City Construction Company, and Sac City State Bank, Assignee, Respondents,

v.

**UNITED PACIFIC INSURANCE COMPANY**, an Insurance Corporation, Appellant.

No. 50837.

Supreme Court of Missouri,

Division No. 2.

June 14, 1965.

Motion for Rehearing or for Transfer to Court En Banc Denied July 12, 1965.

Wm. F. Milligan, Glenn E. McCann, Kansas City, Thomas L. McCullough, Sac City, for respondents.

Lucian Lane, Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, for appellant.

EAGER, Presiding Judge.

This is a suit by a subcontractor and his assignee upon a performance and payment bond furnished to cover labor and materials on a government project. The defense is that the subcontractor did not properly perform his contract and is not entitled to the balance allegedly due. Plaintiff-assignee recovered judgment, in a trial without a jury, for $15,754.23 and, after the overruling of several after-trial motions, this appeal followed.

The United States Army awarded a general contract to J. W. Bateson Company of Dallas, Texas, for the construction of 1,329 housing units for military personnel at Ft. Leonard Wood, Missouri. Bateson let a subcontract to Tetyak Construction Company, a Missouri corporation, for the construction of approximately 21 miles of streets, drives and carports. That contract, dated September 22, 1958, required Tetyak to furnish all material and perform all work described in accordance with the conditions, plans and specifications prepared by the Corps of Engineers. The work included the laying of a "base course aggregate" of crushed rock according to the specifications to which we shall refer later. It also required the laying of the actual asphalt, but our controversy does not reach that stage. Tetyak acquired, by purchase or lease, land on the Roubidoux River (apparently dry) some 7–8 miles from the job as a source of river gravel. The evidence shows, without contradiction, that his superintendent Richard E. Peterson and probably Tetyak himself, were warned in advance by local people that this type of rock when crushed might not "key in" or settle down to a tight mixture as required for the base of the streets, without the use of some "additive"; in other words, it might not be compact enough.

Peterson then investigated the possibility of obtaining dolomite rock dust as such an additive. Tetyak also purchased or leased a "mixer" at substantial cost, which he located near the construction site, several miles from the river. All this occurred before Robson, the plaintiff, entered the picture.

Tetyak had no rock crushing equipment and plaintiff Robson was recommended to him; Robson's headquarters were in Iowa. Robson, Tetyak and Peterson met several times on the site to discuss the situation. On or about February 24, 1959, plaintiff Robson and Tetyak Construction Company, Inc., executed the contract now in issue. It recited that Tetyak had rock for crushing but did not have crushing facilities to meet the standards required by the specifications, and that plaintiff had agreed to crush the rock delivered to him at his plant to be established; it was further provided therein that: "The contractor agrees to crush all rock supplied to him at his plant site at Fort Leonard Wood, Missouri, by the owner, in such quantities and sizes as is necessary to meet the specifications for base material and asphalt aggregate material hereunto attached. The contractor shall reject any rock supplied to it by the owner which cannot be processed by the contractor to satisfactorily meet the specification requirements. Crushed rock base material and asphalt aggregate material shall be delivered by the contractor at his plant site. Owner agrees to take material from plant." The price agreed upon for crushing the base material was 41 cents per ton; there were certain more or less formal provisions regarding progress payments, final payment, insurance, bonds and time of performance. The contract concluded with the following provision: "The Owner may order changes in the work, the Contract sum being adjusted accordingly. All such orders and adjustments shall be in writing. Claims by the Contractor for extra cost must be made in writing before executing the work involved. The Owner shall furnish the name or names of his agents or representatives authorized to order, direct, approve and sign for changes or extra work to be performed by the Contractor." It was shown that Peterson, Tetyak's superintendent, prepared this contract, apparently by using portions of other contracts and by improvising the parts specifically applicable here. It is not contended that Robson had any part in its actual preparation. The contract recited that the specifications were attached, but in fact they were not; Robson testified that he had gone over them with Tetyak and Peterson. He further testified that Tetyak and Peterson had then stated that they knew that the material to be used would not "match" the specifications exactly, and that he, Robson, knew from what they told him that something would have to be added to the rock which he crushed. We will ordinarily refer to Robson as the plaintiff, for convenience.

In late February or March, 1959, plaintiff moved in his crusher and set it up at the river bank. Peterson was in full charge of the operations of Tetyak except for those occasions, perhaps once in two weeks, when Tetyak was present himself. Peterson stated that he was in charge probably 80% of the time. The Tetyak employees scooped the gravel out of the riverbed and delivered it to the intake of the crusher; they also took it in the crushed form in trucks immediately from the crusher belt and hauled it to such locations as they chose. At the trial there were strenuous objections to evidence of the various conversations and dealings between Peterson and plaintiff and to the directions given by Peterson; this, upon the theory that plaintiff had pleaded only the written contract, was bound by it, and that he was thus seeking to vary it by parol, and to recover upon a different and partly oral agreement. The trial court heard the testimony and, in the view we take, it is necessary to recite its substance. From the beginning of the crushing in March, 1959, the laboratory of the Corps of Engineers made "sieve tests" and other tests of the crushed rock to see if it met the gradation and plasticity requirements of the specifications. It will be unnecessary to describe these tests in detail. The principal require-

ment of the specifications, so far as we are concerned, was that the crushed rock going into the streets should consist of a mixture of specified percentages of varying sizes, with some leeway allowed in each grade; the permissible sizes (actually in six gradations) were from slightly over one inch to a very finely crushed material, perhaps dustlike. Some of the samples were taken from the crusher, some from a stockpile which Tetyak established about a mile from the project, some from piles where the crushed rock had been dumped, and some from the base actually laid for streets; some of these test samples were taken by Peterson, some by the engineers. Twenty-five of thirty-two samples were reported as deficient in gradation (or otherwise), most frequently because too much of the material was passing through the one-half inch screen although, as Peterson testified, the rock too often ran in "the middle area" with not enough fine and not enough coarse. Peterson discussed the situation with the engineers almost daily and with Robson or his son almost continuously; he directed Robson as to the settings of his crusher and from time to time had him crush specific sizes which were taken away to mix in with rock already crushed. No complaint was made at any time to plaintiff by Tetyak or Peterson about the manner of his crushing operation or its results. During all this time it is indicated that Tetyak was operating his mixer at the job site attempting thereby to obtain the specified gradations. At one time Peterson had plaintiff dig up, screen, and furnish some fine loam soil to be used at the mixer as an additive, in an attempt to get the mixture to compact or "key in"; Peterson testified that Tetyak would not or could not (financially) bring in the dolomite rock dust which was the additive element really needed; also, that they were handicapped by the very wet spring and, to some extent, by deficiencies in the original sub-base laid by someone else. Peterson made the significant statements that: "Well, we told them what sizes to crush—we crushed the rock as close to the specifications * * * as was possible

with the type of rock." Peterson and Tetyak had thus assumed a mixing operation of the crusher run, coarse rock and loam soil, in which they eventually failed. Peterson described plaintiff's crusher as a normal one, the type commonly used; he testified on cross-examination: that "we" were looking for someone who knew how to crush rock so that it would meet the specifications (by an affirmative answer to a leading question), but added that they wanted someone who would "crush the rock so we could complete the Bateson job"; that the approval of the riverbed gravel by the engineers merely meant that they would accept it as *rock*, i. e., that it was hard enough, if it could be processed to specifications, but that this rock would not initially crush into the required gradations with Robson's crusher or any crusher; that "we" did not think in advance that the rock would come off the crusher to meet the specifications, and that he felt that the crushing was properly done. Plaintiff testified: that from what Tetyak and Peterson told him in the first place he doubted that the rock could be crushed to specifications without mixing in an additive; that he had examined the specifications before signing the contract but that he had no copy, and that he crushed the rock just as he was directed to do it from time to time. Peterson was not an officer of the Tetyak Corporation. Tetyak defaulted on the job in early June, 1959, after paying plaintiff only $7,000. The paving job was then completed by a new subcontractor, O'Donnell Brothers Construction Company. Plaintiff pulled out his crusher shortly after Tetyak's default.

Mr. Frank S. Gilmore, a consulting engineer of wide experience in road building and like fields, testified for defendant; generally, his testimony was: that he visited this job site on behalf of defendant United Pacific for two or three days beginning about June 15, 1959; that he saw the riverbed gravel, and the various piles of crushed rock; that plaintiff's crusher was still there; that the crushed rock he saw laid on the streets was predominantly coarse and not

tightly compacted; that one pile he saw was too fine; that the tests employed by the Corps of Engineers were nationally recognized and standard tests; that he later acted as a consultant for O'Donnell Brothers and was asked for an opinion as to whether the material was "useable"; that O'Donnell did use the same gravel, but he moved in processing equipment "which includes crushers, two or three crushers sometimes, screens for separating the various sizes and then for recombining after * * the material has been crushed and separated * * *"; that this equipment produced a satisfactory end product; that much of the material which O'Donnell used from the riverbed was "finer" because the coarser material had already been "skimmed off." He further testified: that 1¼ inch gravel was not acceptable in the specifications; that it is more difficult to crush river gravel to specifications than ordinary rock; that some of the stock pile material left by Tetyak and some of the aggregate laid as a base in streets was removed and reprocessed at substantial expense, and was thus used for asphalt aggregate; that none of the rock crushed by plaintiff was eventually used on the streets except through such reprocessing; that contractors frequently do maintain a mixing machine at the job site to blend the crushed rock; that O'Donnell took a fine material out of the riverbed consisting of sand and silt and perhaps a little clay, and blended this in as an additive; that O'Donnell had and used a separate piece of equipment known as a "Pug Mill" for the final blending of the materials, whereas Tetyak had apparently been attempting to do that job with a cement mixer.

Tetyak Construction Company was named as a defendant, but it was never served and it dropped out of the case. There is no real controversy over the amount of rock crushed nor indeed over the *amount* of the judgment rendered, defendant insisting that *nothing* is due. It is conceded that Robson assigned all of his interest to the Sac City State Bank, which is now the real plaintiff but, as already indicated, Robson will frequently be referred to as the plaintiff, as a matter of convenience.

The trial court found in part: that plaintiff had performed all the conditions required of him by the contract; that he had crushed to the specifications supplied by Tetyak and according to its directions; that Tetyak took the material and accepted it as satisfactory in so far as plaintiff was concerned; that Tetyak expected to "blend" the rock and attempted to do so, and that all concerned knew that "additives" would be necessary; that plaintiff was not required by its contract to "blend" the rock; that Tetyak waived any requirements which there may have been that the rock be crushed according to the engineers' specifications or any specifications except Tetyak's. Its conclusions of law were, in part: that United Pacific could not assert any defense which Tetyak could not have asserted; that any ambiguities should be construed against Tetyak and its surety since they prepared the contract through Peterson; that plaintiff had performed all of the conditions of his contract and was entitled to judgment, as aforesaid.

We shall refer to the United Pacific Insurance Company as the defendant. It insists here: that plaintiff pleaded the written contract and his performance thereof as the sole basis of his action, that he is bound by its terms, and that he must recover strictly upon it if at all; that the court committed error in admitting testimony to alter and vary the terms of the contract and in permitting a recovery upon a supposed new oral agreement; that plaintiff totally failed to perform his written contract, since his product did not meet the engineers' specifications, and that the surety is entitled to make this defense; and, lastly, that since this bond was given for construction on United States property where no lien may be asserted, plaintiff may not recover because the bond stands in lieu of a lien and no part of plaintiff's product entered finally into the construction. The plaintiff, aside from assertions of certain recognized procedural rules, argues: that

the courts will accept as performance of a contract that which the parties themselves have agreed upon and have accepted as such; that any and all ambiguities must be resolved against the defendant, and that in such instances the interpretation placed upon a contract by the conduct of the parties is of great weight; that the surety may not assert any defense which the principal could not have asserted, and that it is estopped if the principal would be estopped; that the federal law does not require, as a condition to recovery, that the materials shall have actually gone into the construction.

■■■ We shall not consume time or space in the discussion of well-recognized principles presented, such as the mode of appellate consideration in a jury waived case. Civil Rule 73.01(d), V.A.M.R.; Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 850; Norman v. Durham, Mo., 380 S.W.2d 296. It is true that ordinarily a plaintiff may not declare upon an express written contract and recover upon some other agreement. Papen v. Friedmeyer, Mo.App., 255 S.W.2d 841, 845; Laclede Construction Co. v. Tudor Iron Works, 169 Mo. 137, 69 S.W. 384. But, in passing, we note that it is difficult to find or state a rule of contract law which does not at times have its variations or exceptions. We do not consider it decisive here that a copy of the engineers' specifications was not literally attached to plaintiff's copy of the contract; he had seen them and knew of them. There is also no doubt that the surety is entitled to raise all those defenses which the principal would have, such as nonperformance, but that it is limited to such defenses. J. R. Watkins Co. v. Lankford, 363 Mo. 1046, 256 S.W.2d 788; Union State Bank v. American Surety Co., 324 Mo. 438, 23 S.W.2d 1038, 1044; State ex rel. and to Use of Gieringer v. Kilgore, Mo.App., 238 S.W. 2d 874; Modern Brokerage Corp. v. Massachusetts Bonding & Ins. Co. (DC NY), 54 F.Supp. 939. And, of course, we recognize the rule, subject to its many extensions and exceptions, that parol evidence may not be used to alter the terms of a written agreement. Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817, 820.

The real issues here are: (1) Was the contract entirely clear or was it ambiguous? (2) If the contract was ambiguous, does the evidence show that the plaintiff's performance was complete and sufficient? (3) Did Tetyak accept plaintiff's acts as a full performance of the contract on his part and, if so, is such acceptance binding on United Pacific?

■■■ The contract was not expertly prepared. Encompassed in the issues just stated is the question,—was it the duty of plaintiff or of Tetyak to produce the final mixture or blend which would meet the engineers' specifications? The contract recited that *Tetyak* had contracted to lay the rock according to "the plans and specifications," but the specific agreement of plaintiff was to crush all rock supplied to him "in such quantities and sizes as is necessary to meet the specifications * * * hereto attached"; following that was the provision that plaintiff "shall reject all rock which cannot be processed by the contractor (plaintiff) to satisfactorily meet the specification requirements." As we construe the instrument, the agreement to crush the rock "in such quantities and sizes" as necessary to meet the specifications was not an agreement that the product as it came from the crusher would then and there meet all such requirements; that wording definitely suggests the interpretation that plaintiff would crush the various sizes as directed by Tetyak who, by taking the rock immediately from the crusher, assumed the duty of properly mixing it, using additives if necessary, and getting the final approval. The next sentence, expressed by indirection, requires plaintiff to reject "any rock" (and it was all of the same type) which could not be processed *by him* to meet the specifications. If that sentence, so worded, was an actual requirement applicable to the crushing itself and

the end product (quaere) it certainly imposes, or seeks to impose, a stricter obligation than does the preceding sentence; in other words, it would thereby infer an obligation on plaintiff that *he* process the rock to specifications. These two requirements are inconsistent and they render plaintiff's obligations under the contract, and the contract itself, ambiguous; another way of expressing this is that the contract is reasonably susceptible of different constructions. Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262. We so hold. That being true, certain rules become applicable as ancillary rules of construction. The interpretation which the parties themselves have placed upon the contract by their conduct will be given great weight. Landau v. Laughren, Mo., 357 S.W.2d 74. When other means of construction fail, a written contract is generally construed more strictly against the party who drew it. Engel v. Cord Moving & Storage Co., Mo. App., 313 S.W.2d 173. When a contract is ambiguous, parol evidence is admissible (Friedman Textile Co. v. Northland Shopping Center, Inc., Mo.App., 321 S.W.2d 9, 14–15, and cases next cited) to show the surrounding circumstances and the relationship of the parties as indicating their real intent and the meaning of the contract, and also to show the practical construction placed upon the contract by the parties. Paisley v. Lucas, supra, and cases there cited; Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507, and numerous cases cited; P R T Inv. Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, 318; Hart v. T. L. Wright Lumber Co., 355 Mo. 397, 196 S.W.2d 272, 277. Such a contract will then be given a construction which will make it fair and reasonable between the parties. Paisley, Veatch. The real intention of the parties is the universal rule of construction. Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415.

 We hold that the oral testimony as to the actual operations was admissible and that it was properly considered by the trial court. We must, of course, make our own findings and conclusions, giving deference to the trial court, primarily on matters of credibility. On the latter phase it is obvious that he believed the testimony of Mr. Peterson and we see no reason why we should not do so. Considering the testimony as a whole, it appears that both of the parties to the contract intended that plaintiff should simply bring in his crusher (with no blending or mixing machinery), set it up, and receive and crush the rock on the settings and to the sizes directed by Tetyak; that the latter would take the crushed rock direct from the crusher and attempt by his own operations to meet the gradation (and other) requirements of the specifications. In fact it clearly appears that plaintiff's crusher, without a "Pug Mill" or some similar device, was simply not equipped to produce the completed product and that Tetyak, from his early investigations, knew that fact. He had a "mixer" on the job before plaintiff was ever consulted or employed. Plaintiff merely had and operated an ordinary rock crusher, as Tetyak and Peterson knew, which would not do the complete job on this difficult type of rock. Any other construction would simply mean that plaintiff had been led into a trap, from which he had no means of escape. We find and conclude that, on the evidence as a whole and according to the real intent of the parties, plaintiff performed his part of the contract.

 Moreover, the conclusions just stated are substantially compelled by the actual construction placed upon the contract by the parties themselves, both prior to and during the entire period of operations. Some question has been raised as to Peterson's authority to "change" the contract. It is true that he was not an officer of Tetyak and he was never designated as one to make any changes, but in our view he was not changing the contract, as we have construed it. He was merely carrying out a course of conduct instituted by Tetyak himself in the first instance, and continued with the full acquiescence of Tetyak on his

various trips to the project; we may certainly infer that Tetyak knew of everything that was being done. Peterson specifically tried over a period of time to get Tetyak to buy and bring in dolomite rock dust to meet the difficulties. Also, except for the occasions of Tetyak's visits, Peterson was the one person in sole charge. He directed the crushing of the sizes and he (and Tetyak) accepted the crushed gravel as a performance of the contract according to the original intent of the parties. He was certainly authorized to do that, since he and Tetyak and plaintiff had frequently consulted on that matter. It was not necessary that there should be a new consideration for a new contract, for there was no new contract. We hold that plaintiff was entitled to recover on the written contract as pleaded and as we have interpreted it. The fact that the price of 41 cents per ton for crushing was continued is, to some extent, corroboratory of the fact that the parties were not attempting to change the original contract, but merely to perform it as agreed, and to make and *accept* the performance.

There is a recognized rule to the effect that, where the parties to a contract have agreed upon the acts which will be accepted as full performance of a contract, the courts will generally follow that agreement. The rule is applicable here, whether as an independent rule of construction, or as corroboratory of the construction which we have heretofore placed upon the contract. See: Woolfolk v. Jack Kennedy Chevrolet Co., Mo.App., 296 S.W. 2d 511, 514–515; Newport v. Hedges, Mo. App., 358 S.W.2d 441; In re Wolozin's Est. (Surr.Ct.N.Y.), 194 Misc. 212, 86 N.Y. S.2d 73, aff. Sup.Ct., 276 App.Div., 825, 93 N.Y.S.2d 717; Aaron v. Aaron (Tex.Civ. App.), 173 S.W.2d 310. In Woolfolk, supra, the court said, 296 S.W.2d loc. cit. 514– 515: "There is good reason and authority for holding that whatever the parties see fit to accept as performance of the contractual obligations will be so regarded by the courts. 17 C.J.S. Contracts § 494, pp.

999, 1000; 13 C.J., Contracts, § 767, pp. 673, 674; 12 Am.Jur., Contracts, § 355 Note 13, p. 921; Murray v. Farthing, 6 Mo. 251; Wells v. Hocking Valley Coal Co., 137 Iowa 526, 114 N.W. 1076; Aaron v. Aaron, Tex. Civ.App., 173 S.W.2d 310. It is true that there was not an acceptance by plaintiff in express terms, but the facts and circumstances point inevitably to an acceptance, which by sound authority may be implied from conduct. 12 Am.Jur., Contracts, § 356, p. 922." Plaintiff here pleaded the contract and its performance on his part; defendant-surety denied that there was performance. Thus, the question of performance or no performance was in issue under the pleadings, and the principle just stated is applicable, particularly in construing an ambiguous contract. The application of this principle is not inconsistent with, nor is it an abandonment of, the original theory of an action on the contract. Tetyak would certainly not have any defense of nonperformance under these circumstances and, since the surety merely "stands in the shoes of the principal contractor," Modern Brokerage Co. v. Massachusetts Bonding & Ins. Co., (DC NY), 54 F.Supp. 939, it follows that United Pacific likewise has no such defense.

One final point remains, which may be covered briefly. Defendant asserts that, since such a bond on a government project stands in lieu of lien rights for labor and material, there can be no recovery unless the material actually went into the construction. Certainly, we shall accept no such proposition unless the bond or the federal law so provides, and specifically. This bond for payment, with Tetyak as subcontractor and principal and United Pacific as surety, ran to Bateson, the general contractor. Among its provisions was the following: "* * * if the Subcontractor shall pay all persons who have contracts directly with the Subcontractor for labor or materials, failing which such persons shall have a direct right of action against the Subcontractor and Surety under this obligation, subject to General Contractor's priority,

then this obligation shall be null and void; otherwise, it shall remain in full force and effect; * * *." No one contends that this bond is not available by its terms to plaintiff who had a contract with Tetyak. The bond contains no provision whatever requiring that any such unpaid labor or materials shall have actually entered into the construction as finally completed and accepted. Indeed, it only required that the claimant *have a contract* "directly with the Subcontractor for labor or materials * *," which plaintiff most assuredly did. Defendant's theory seems to be that since there can be no mechanic's lien on a government job, the requirements of a mechanic's lien claim are somehow automatically affixed to this bond. We have considered the cases cited by it, namely, Chouteau Trust Co. v. Massachusetts Bonding & Ins. Co. (CA 8), 1 F.2d 136, and Wiss v. Royal Indemnity Co., 219 Mo.App. 568, 282 S.W. 164, and also those cited by plaintiff, Glassell-Taylor Co. v. Magnolia Petroleum Co., 5 Cir., 153 F.2d 527, Autrey et al. v. Williams & Dunlap, D.C., 185 F.Supp. 802, National State Bank v. Terminal Construction Co., D.C., 217 F.Supp 341. While some statements are made indicating that at least one *purpose* in requiring bonds on public works is to protect those who would have no lien rights against a governmental unit, we find nothing to indicate that a laborer, materialman or contracting party suing on such a bond must perforce prove that his labor or materials actually entered into the construction unless the statute under which the bond is given or the bond itself fairly so provides. In other words, the labor or material need not, of necessity, be such as would be lienable, unless the statute or the bond fairly so requires. Hilton v. Universal Construction Co., 202 Mo.App. 672, 216 S.W. 1034, 1036–1037.

The present bond was furnished under the so-called Capehart Act, Title 42 U.S. C.A. § 1594, governing contracts for military housing. That Act does not provide the form of bond, but merely that it be "satisfactory to the Secretary of Defense * * *." Forms have apparently been adopted. If the Miller Act provisions dealing with bonds on contracts for public buildings or public works, generally, are deemed to be incorporated into the Capehart Act, the two statutes are harmonious, and the requirement there merely is that the bond shall protect all persons who supply "labor and material in the prosecution of the work * * *." Title 40, U.S.C.A., § 270a et seq. Autrey et al. v. Williams & Dunlap, supra; National State Bank of Newark v. Terminal Construction Co. et al., supra. And, in the last case cited the court said, at 217 F.Supp. loc. cit. 360–361: "The liberal construction given to the Heard Act is also to be given in cases arising under the Miller Act. * * * 'The courts have refrained from attempting an all-inclusive definition of [labor and] material furnished in the prosecution of the work.' United States for Use and Benefit of J. P. Byrne & Co., v. Fire Association of Philadelphia, 260 F.2d 541, 543–544 (2d Cir., 1958). The test developed by the courts is that the labor and materials must be furnished in the prosecution of the work. The Miller Act 'does not require that the labor or material furnished be actually used or incorporated into the contract work.' Fourt v. United States for Use and Benefit of Westinghouse Electric Supply Co., 235 F.2d 433, 435 (10th Cir., 1956)." That case is also authority to the effect that a suit such as this may be filed by the claimant in his own name, and that the state courts and the federal district courts have concurrent jurisdiction. See also Autrey, supra. And see, generally, D & L Construction Co. v. Triangle Elec. Supply Co. (CA 8), 332 F.2d 1009; Fourt et al. v. United States (CA 10), 235 F.2d 433. In Fourt it was also expressly held that, under the Miller Act, the labor or material furnished need not be shown to have been actually used or incorporated into the construction. We conclude that neither the applicable statutes nor the bond itself makes any such requirement and the point is denied.

The judgment as entered runs in favor of the assignee Bank and against United Pacific Insurance Company in the amount of $15,754.23. It is hereby affirmed.

All of the Judges concur.